USCA1 Opinion

 

 April 12, 1996 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1016 UNITED STATES, Appellee, v. FELIPE RAMIREZ-FERRER, Defendant - Appellant. ____________________ No. 94-1017 UNITED STATES, Appellee, v. JORGE L. SUAREZ-MAYA, Defendant - Appellant. ____________________ No. 94-1018 UNITED STATES, Appellee, v. PAUL TROCHE-MATOS, Defendant - Appellant. ____________________ ERRATA SHEET The en banc opinion of this Court issued on March 27, 1996, is amended as follows: On the cover sheet, government's counsel should read: Kathleen A. Felton, Attorney, Department of Justice, with whom ___________________ Guillermo Gil, United States Attorney, Jos A. Quiles-Espinosa, _____________ ________________________ Senior Litigation Counsel, and Epifanio Morales-Cruz, Assistant _____________________ United States Attorney, were on supplemental brief for appellee. UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1016 UNITED STATES, Appellee, v. FELIPE RAMIREZ-FERRER, Defendant - Appellant. ____________________ No. 94-1017 UNITED STATES, Appellee, v. JORGE L. SUAREZ-MAYA, Defendant - Appellant. ____________________ No. 94-1018 UNITED STATES, Appellee, v. PAUL TROCHE-MATOS, Defendant - Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Juan M. P rez-Gim nez, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ Selya, Cyr, Boudin, Stahl and Lynch, Circuit Judges. ______________ _____________________ Roxana Matienzo-Carri n, by Appointment of the Court, for _______________________ appellant Felipe Ram rez-Ferrer. Ram n Garc a-Garc a for appellant Jorge L. Su rez-Maya. ___________________ Francisco Serrano-Walker for appellant Ra l Troche-Matos. ________________________ Kathleen A. Felton, Attorney, Department of Justice, with __________________ whom Guillermo Gil, United States Attorney, and Jos A. Quiles- _____________ ________________ Espinosa, Senior Litigation Counsel, and Epifanio Morales-Cruz ________ _____________________ were on supplemental brief for appellee. ____________________ March 27, 1996 ____________________ OPINION EN BANC ____________________ -2- TORRUELLA, Chief Judge. Defendants-appellants TORRUELLA, Chief Judge ______________ (collectively, "defendants") Felipe Ram rez-Ferrer ("Ram rez- Ferrer"), Jorge L. Su rez-Maya ("Su rez-Maya") and Ra l Troche- Matos ("Troche-Matos") appeal to this court their convictions on drug and firearm charges. A panel of this court: 1) affirmed the convictions of all defendants for possession of cocaine with intent to distribute; 2) affirmed the convictions of Su rez-Maya and Ram rez-Ferrer for using a firearm in relation to a drug trafficking offense, but reversed the conviction of Troche-Matos on a similar charge; and 3) reversed the convictions of all defendants for importation of narcotics into the United States. Thereafter, the full court reheard the case en banc. The en banc __ ____ __ ____ court now reverses the convictions of all defendants for importation of narcotics into the United States and remands the firearm convictions for further consideration in light of an intervening Supreme Court decision. I. BACKGROUND I. BACKGROUND The evidence, taken in the light most favorable to the government, United States v. Abreu, 952 F.2d 1458, 1460 (1st ______________ _____ Cir.), cert. denied, 503 U.S. 994 (1992), permitted the jury to ____________ find the facts that follow. We emphasize the facts pertinent to the importation charge. On March 13, 1993, the Police of Puerto Rico ("POPR") received an anonymous telephone call. The caller informed the POPR that defendant Su rez-Maya and three other individuals had left for Mona Island, Puerto Rico, in a boat belonging to a relation of Su rez-Maya, and that the four men -3- were going to acquire a load of cocaine and ferry it to the main island of Puerto Rico. Mona Island is one of numerous small islands near Puerto Rico's main island, and is part of the Municipality of Cabo Rojo, which also includes part of the main island's southwest corner.1 Mona Island is physically separated by about 39 miles of water from the main island of Puerto Rico. Prior to 1989, the boundaries of the United States extended three miles offshore. United States v. Williams, 617 _____________ ________ F.2d 1063, 1073 n.6 (5th Cir. 1980). In that year, they were extended by Presidential Proclamation with qualifications to 12 miles. Proclamation No. 5928, 54 Fed. Reg. 777 (1989) (citing the 1982 United Nations Convention on the Law of the Sea, to which the U.S. is a signatory, but which the U.S. had not ratified as of February, 1996). Thus, given the 12-mile limit, to travel from Mona Island to the main island of Puerto Rico requires that a vessel cross international waters. After verifying that the boat in question was indeed away from its mooring, the United States Customs Service (USCS) and POPR flew to Mona Island on a USCS helicopter. The  ____________________ 1 The only evidence in the record is that defendants picked up ________ ______ the cocaine at Mona Island. Mona Island is not just geographically part of the Puerto Rico Archipelago, which includes the Islands of Puerto Rico, Culebra, Vieques, Desecheo, Caja de Muertos, Mona and Monito, as well as various other minor islets and keys. Mona Island is also politically part of the Senatorial District of Mayaguez and of the Municipality of Cabo Rojo within that district. P.R. Const. art. VIII, 1, IV. Thus, in effect, the defendants transported the drugs in question between two points within the same municipality within Puerto Rico, the equivalent of within two places within Suffolk County in Massachusetts. -4- authorities located the subject boat and Su rez-Maya, accompanied by three other men as described. At approximately 12:30 p.m. the next day, the authorities learned that the boat was leaving Mona Island. The boat was interdicted about one mile off the southwest coast of Puerto Rico. After the boat was seized, it was found to be carrying about 16 kilograms of cocaine. A subsequent inventory search of the boat turned up a firearm. The seized firearm, a loaded revolver, was found covered by a T-shirt, behind a storage compartment near the location where Ram rez-Ferrer had been seated at the time of the interdiction. The search also revealed evidence linking the vessel to a relative of Su rez-Maya. On March 31, 1993, a grand jury indicted defendants, charging all three in each of three separate counts. The indictment charged each with possessing approximately 16 kilograms of cocaine with intent to distribute (count 1), 21 U.S.C. 841(a) (1) (1994); with importing such cocaine into the United States (count 2), id. 952(a) (1994); and with possessing ___ and carrying a firearm in relation to a drug trafficking crime (count 3), 18 U.S.C. 924(c)(1) (1994). A superseding indictment corrected the description of the seized firearm in count 3. On September 28, 1993, a jury convicted all three defendants on each count. On counts 1 and 2, relating to possession and importation of cocaine, Su rez-Maya was sentenced to life imprisonment, Ram rez-Ferrer to a term of 240 months, and -5- Troche-Matos to a term of 120 months. The sentences of Su rez- Maya and Ram rez-Ferrer were enhanced under 21 U.S.C. 841(b) and 960(b) on account of prior drug crimes. On count 3, the gun count, each appellant was sentenced to a mandatory minimum term of 60 months to be served consecutively, as required by the statute. In a decision released April 27, 1995, a panel of this court reversed all three defendants' importation convictions, reversed Troche-Matos' firearm conviction, and affirmed the remaining convictions. On June 26, 1995, this court agreed to rehear the case en banc on the issue of the importation statute's __ ____ interpretation. Additionally, the court asked the parties to address again the firearms convictions of Ram rez-Ferrer and Su rez-Maya. The en banc court heard oral argument on __ ____ September 13, 1995. While the case was pending before the en __ banc court, the Supreme Court on December 6, 1995 issued its ____ opinion in Bailey v. United States, ___ U.S. ___, 116 S. Ct. 501 ______ _____________ (1995), overturning precedent in this and other circuits as to the proper construction of the term "use" in section 924(c)(1). II. THE POSSESSION CHARGE AND THE FIREARM CHARGE II. THE POSSESSION CHARGE AND THE FIREARM CHARGE On the possession charge under count 1, the panel concluded that the evidence was sufficient to show that the defendants knowingly possessed the drugs or aided and abetted their possession. Among other evidence, the testimony permitted the jury to conclude that the drugs were stored in a bag with a broken zipper and that the drugs were plainly visible from -6- outside the bag, easily seen by anyone on the 20-foot boat. The en banc court did not request further argument on this issue. __ ____ On the firearm charge, the story is more complicated. Section 924(c)(1) is directed against anyone who "uses or carries a firearm during and in relation to a drug trafficking crime" and the district court charged the jury with the language of the statute, defining "use" in accordance with circuit precedent.2 Assuming that each appellant was aware of the revolver, its presence on the vessel made it available for use to protect the drugs. The panel ruled that, assuming knowledge of the firearm, its proximity and potential for use permitted the jury to convict under the so-called "fortress" theory previously adopted by this court and others. See, e.g., United States v. Wilkinson, 926 ___ ____ _____________ _________ F.2d 22, 25-26 (1st Cir.), cert. denied, 111 S. Ct. at 2813 ____________ (1991). The panel had more difficulty with the question of whether a reasonable jury could find that each of the defendants knew that the gun was present; unlike the drugs, the gun was not in plain view. The panel upheld the conviction of Ram rez- Ferrer, since the revolver was located behind a compartment adjacent to his seat and served an obvious purpose to protect the cocaine. The panel also upheld the conviction of Su rez-Maya, who was the central figure in the drug venture and the captain of  ____________________ 2 The indictment mistakenly charged the defendants with "having possess[ed] and carr[ied] the firearm." There is no claim that the variance was prejudicial error. -7- the boat. As to Troche-Matos, the court ruled that a reasonable jury could not infer that he knew of the weapon. In their petitions for rehearing on this issue, Su rez- Maya and Ram rez-Ferrer drew our attention to United States v. _____________ Torres-Maldonado, 14 F.3d 95 (1st Cir. 1994), arguing that on ________________ somewhat similar facts a panel of this court had found the evidence insufficient to support convictions under section 924(c)(1). In that case, the weapon was found in a zippered opaque tote bag on a sofa in a room in which drugs and money were also found, and the court concluded the evidence was not adequate to establish that two of the individuals in the room actually or constructively possessed the weapon. Id. at 102. Despite its ___ differing outcome, Torres-Maldonado does not conflict with the ________________ original Ram rez-Ferrer panel on the proper legal standards to be ______________ applied. Although the en banc court agreed to rehear the case as __ ____ a whole, sufficiency of the evidence is not normally a question for en banc consideration unless a mistaken legal standard has __ ____ been used. Any possible tension between the panel opinion and the decision in Torres-Maldonado stems from their appraisals of ________________ their own respective facts. But given the kaleidoscope of different facts presented in drug and gun cases and the varying compositions of panels in the court, the en banc court was, and __ ____ remains, of the view that differences in weighing evidence are inevitable in cases of this kind even within a single circuit. Nothing will produce perfect harmony among outcomes unless the -8- court chooses to hear every drug and gun case en banc, a course __ ____ that is neither practical nor useful. Therefore, we conclude that the full court should not seek to decide en banc whether the __ ____ evidence against each appellant in this case was or was not sufficient on the gun charge. As a result, the en banc court __ ____ declines to review the adequacy of the evidence on either count 1 or count 3. This does not end the matter. While the en banc __ ____ opinion was being prepared, the Supreme Court decided Bailey. ______ There, the Supreme Court determined that a conviction for firearm "use" under section 924(c)(1) required "evidence sufficient to show an active employment of the firearm by the defendant, a use ______ __________ that makes the firearm an operative factor in relation to the predicate offense." Bailey, ___ U.S. at ___, 116 S. Ct. at 505. ______ As far as "use" is concerned, the Supreme Court rejected the fortress theory, disagreeing with the suggestion that "a gun placed in the closet is 'used' because its mere presence emboldens or protects its owner." Id., ___ U.S. at ___, 116 S. ___ Ct. at 508. Although the Supreme Court has rejected the fortress theory of "use" under which defendants were convicted, the issue of their firearm convictions remains unresolved. Section 924(c)(1) imposes a prison term upon a person who "during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm." 18 U.S.C. 924(c)(1) (emphasis added). _______ Defendants were convicted on a gun count that went to the jury -9- with instructions that permitted the jury to convict if it found that defendants either used or carried the weapon found under the T-shirt behind Ram rez-Ferrer. The interpretive problems posed by the term "carry" are apparent, given the shadow that Bailey ______ casts over previous circuit precedent. Moreover, Bailey contains ______ little comment on the proper scope of "carry" in section 924(c)(1). By contrast, the Supreme Court went on to state that "use" cannot extend to hypothetical situations where the offender has "hid[den the firearm] where he can grab it and use it if necessary," id., ___ U.S. at ___, 116 S. Ct. at 508, a ___ description that, in the best light for the government, includes the set of facts before this en banc panel. However, the Court __ ____ went on to state that the carry prong could cover situations that the use prong could not, noting that a firearm can be carried without being used, "e.g., when an offender keeps a gun hidden in ____ his clothing throughout a drug transaction." Id., ___ U.S. at ___ ___, 116 S. Ct. at 507. As a result, defendants' conviction for "use" should be vacated, and they should face only reconsideration of their convictions under the carry prong, since Bailey has both limited the word "use" to the extent that it ______ cannot apply in the instant case and emphasized that "carry" has meanings not covered by "use." Id., ___ U.S. at ___, 116 S. Ct. ___ at 508-09 (cautioning against readings of the word "use" that render the term "carry" superfluous, and remanding two unrelated defendants' convictions for consideration under the carry prong). -10- In light of Bailey, then, we decline to decide en banc ______ __ ____ defendants' firearm convictions, and instead require further consideration of count 3 under section 924(c)(1). We think that these problems should be addressed in proceedings before the panel rather than the en banc court.  __ ____ -11- III. THE IMPORTATION COUNTS III. THE IMPORTATION COUNTS In accord with the panel's decision, the en banc court __ ____ has concluded that the importation statute, 21 U.S.C. 952, does not embrace defendants' conduct in transporting 16 kilograms of cocaine from Mona Island, Puerto Rico, to approximately one mile offshore of the main island of Puerto Rico, notwithstanding the fact that the contraband traversed international waters during the journey. The court concludes that this interpretation accords with both the wording of the statute and general principles of statutory construction. Furthermore, absent either pertinent legislative history or precedent, the en banc court __ ____ likewise concludes that the historical application and the potential future application of the statute by the government weigh in favor of this interpretation. A. Statutory Language A. Statutory Language The defendants were convicted under 21 U.S.C. 952(a) for importing drugs into the United States. In relevant part, 952(a) provides that it shall be unlawful . . . to import into the United States from any place outside thereof, any controlled substance. The defendants contend that they did not violate this statute because they did not bring the drugs at issue into the United States from a "place outside thereof." To the contrary, they argue that the evidence in the record only establishes that they brought the drugs from one location within the jurisdiction of the United States (i.e., Mona Island) to another (i.e., the ____ ____ -12- waters off Puerto Rico's main island). The government, on the other hand, claims that, because the drugs passed through international waters on their way from Mona Island, the drugs were brought into the United States from a "place outside thereof" (i.e., international waters). Essentially, the ____ government argues that the quoted language of section 952(a) establishes a kind of transparent curtain around the jurisdictional boundaries of the United States, and proscribes any deliberate shipment of drugs through that curtain without regard to the "place" from which the shipment actually originated. In Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), _________________ _______ the Supreme Court stated: "We need not leave our common sense at the doorstep when we interpret a statute." Id. at 241. The ___ government's newly minted interpretation of section 952(a) not only is contrary to the plain language of the statute, and flies in the face of every common and logical meaning of the word "importation," but also places at risk of prosecution thousands, perhaps hundreds of thousands, of persons who up to now have not been prosecuted under this novel construction of section 952(a). We should, first of all, leave no doubt as to what this case is not about. We are not faced with a factual situation in ___ which a defendant leaves United States domestic territory empty- handed, proceeds to international waters or to a foreign territory to acquire contraband there, and then returns to domestic territory with this contraband (for example, when a -13- vessel leaves the United States, sails out to sea where it obtains drugs from a "mother ship" anchored in international waters, and then returns to the United States). In that hypothetical situation, the government might have a somewhat more convincing argument that international waters can be deemed the "place" from which the controlled substance is being imported into the United States.3 While we might imagine strong arguments on both sides, we are presently faced with a much narrower factual situation. We need only decide whether Congress intended to treat in-transit international waters as a "place" __________ for purposes of the importation statute when the government's evidence shows that both the origination and the destination of thecontrolled substance occurred within United States territory.4  ____________________ 3 We agree with the dissent that both the day hiker who strays into Canadian territory and then crosses back into the U.S., and the tourist returning from British territory, see dissent at 44, ___ would violate section 952 if they carry contraband drugs, because they obviously would be entering U.S. territory from a "place outside thereof." 4 The government treats defendants' trip across the international waters between Mona Island and Puerto Rico's main island as being the same as if defendants had carried drugs from Mona Island into another sovereign nation and then back into Puerto Rico. Doubtless the latter would constitute an importation. International waters, however, are not anything like a sovereign nation. Waters twelve miles beyond Mona Island and the main island of Puerto Rico are "international" in the sense that the vessels of other nations have a right of free navigation through them. See 54 Fed. Reg. 777 (1988) ___ (Proclamation 5928, entitled "Territorial Sea of the United States of America") (citing the 1982 United Nations Convention on the Law of the Sea (to which the U.S. is a signatory, but which the U.S. had not ratified as of January 1996)). For 200 miles, however, they are subject to exclusive United States fishing and mineral rights. See 1982 United Nations Convention on the Law of ___ the Sea, Articles 5, 57, 76(1); Burke, The New International Law _________________________ of Fisheries 1 (1994) (describing this regime as customary _____________ -14- "The starting point in statutory interpretation is 'the language [of the statute] itself.'" United States v. James, 478 _____________ _____ U.S. 597, 604 (1986). In its argument, the government overlooks the fact that the text of section 952(a) includes a separate clause not directly at issue in this case. With this separate clause included, section 952(a), entitled "importation of controlled substances," provides [i]t shall be unlawful [1] to import into the customs territory of the United States from any place outside thereof (but within the United States), or [2] to import into the United States from any place outside thereof, any controlled substance. 21 U.S.C. 952(a). The court concludes that, given a proper interpretation of 21 U.S.C. 952(a), transport from one part of the United States to another does not rise to the level of importation simply by involving travel through international waters. The definition of "import" ("any bringing in") appearing in section 951 does not implicate the origin of a shipment of drugs. Thus, the government argues that the statute  ____________________ international law). See also 43 U.S.C. 1332 (Congressional ________ declaration of policy regarding the outer Continental Shelf). After a United States vessel has gone beyond the twelve-mile- limit into "international" waters, it is not expected to clear United States customs when it reenters United States territory, as would be required had the vessel entered a foreign country during the voyage. Coastal and fishing vessels and private yachts commonly navigate interchangeably in international and domestic waters when making local trips, paying little attention to where the one ends and the other begins, and with no thought that they are making some kind of reentry into the United States upon their return to domestic waters. -15- does not require any inquiry into the origin of a shipment of drugs; by the government's reading, any shipment into the United States that must pass into international waters or airspace would be punishable under clause 2 of section 952(a). However, section 952(a) itself requires that the importation into the United States be "from any place outside thereof" (emphasis added). It ___ _____ is the word "place" in section 952(a), when read together with "from . . . outside," that needs to be considered in the present circumstances, not just the word "import." The government's interpretation rests on the assumption that Congress intended to focus only on a result (i.e., each introduction of the drugs into ______ ____ ____________ the United States), irrespective of whether its place of origin was another part of the United States. But if this were the case, Congress would not have proscribed importation "from any ____ place outside thereof," but merely importation "into the United ____ States," omitting any mention of a place of origin. Furthermore, we should also consider the following test of the "plain meaning" of the word "place" in section 952(a). Anyone aware of the facts in the record of this case, if asked, "From what 'place' was the _____ illegal substance brought?" would answer "From Mona Island," not as is argued, "From international waters." In addition to its failure to comport with the normal understanding of the word "place," the government's interpretation of clause 2 cannot be reconciled with any reasonable reading of clause 1. Clauses 1 and 2 were enacted simultaneously in 1970. If the phrase in clause 2 -- "place -16- outside thereof" refers to the location of the drugs immediately before they pass through the "transparent curtain" into U.S. territory, it must be given the same connotation in clause 1 absent an indication that Congress intended otherwise. See ___ Atlantic Cleaners v. United States, 286 U.S. 427, 433 (1932) _________________ _____________ (noting presumption that a word or phrase used more than once in statute has same meaning); Fortin v. Marshall, 608 F.2d 525, 528 ______ ________ (1st Cir. 1979) (same). The government argues that clause 2 is merely the successor to 21 U.S.C. 174 (enacted in 1909 and repealed in 1970), whereas clause 1 introduces a new concept added to the statute in 1970 out of "an abundance of caution" lest some unidentified types of transportation from U.S. territories into U.S. customs territory might prove nonprosecutable. Although the government states that clause 2 is the direct successor to repealed 21 U.S.C. 174, it points to no pre-1970 case law that would corroborate the thesis that 174 (which imposed penalties against anyone who "fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction") had ever been construed so narrowly as to foreclose prosecution of importation from a U.S. territory not part of the U.S. customs territory (e.g., the United States Virgin Islands, Guam) to part ____ of the U.S. which is part of the U.S. customs territory (i.e., ____ Puerto Rico, the 50 states, and the District of Columbia). We must bear in mind the principle that Courts must presume that Congress knows of prior judicial or executive branch -17- interpretations of a statute when it reenacts or amends a statute. See Lorillard v. Pons, 434 U.S. 575, 580 (1978); Sierra ___ _________ ____ ______ Club v. Secretary of the Army, 820 F.2d 513, 522 (1st Cir. 1987). ____ _____________________ If we presume per Lorillard that Congress knew that pre-1970 _________ decisional law portended no risk of less-than-intended enforcement, we cannot accept the government's thesis that clause 1 was passed out of an "abundance of caution."5 "A statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void or insignificant."6 United States v. ______________ Campos-Serrano, 404 U.S. 293, 301 n.14 (1971); see United States ______________ ___ _____________  ____________________ 5 Moreover, even if we did accept it, we think this thesis actually cuts against the government's reading of the statute. In other words, if Congress had doubts that the existing statute did not proscribe shipment of drugs from a non-customs territory into customs territory, it must have had, a fortiori, even ___________ greater uncertainty that the statute proscribed shipments from customs territory to customs territory (the conduct at issue in this case). But it is clear, that by enacting clause 1, Congress did not proscribe such activity. 6 Although we are charged by our dissenting colleagues with the commission of major mayhem to the canons of statutory construction, this claim may very well be a case of whose ox is gored. See Karl N. Llewellyn, Remarks on the Theory of Appellate ___ __________________________________ Decision and the Rules or Canons About How Statutes Are to Be _________________________________________________________________ Construed, 3 Vand. L. Rev. 395 (1950). It is interesting to _________ note, that by suggesting that the cocaine in question did not originate in Mona Island, see dissent at 35, the dissent itself ___ violates a fundamental rule of appellate review, one which is anchored in elementary principles of due process, to the effect that appellate courts are not to go outside the record. In this case, the suggestion that "Mona Island is a transshipment point" is not only not part of the record but is in fact immaterial to the charge. Puerto Rico or Florida or California are transshipment points of imported drugs to other internal areas of ________ the United States. Yet such internal transshipment of contraband ________ that may have originated outside the United States does not itself constitute a violation of 21 U.S.C. 952, which only covers importation from a "place outside thereof." -18- v. Holmquist, 36 F.3d 154, 160 (1st Cir. 1994) (same). The key _________ to the "whole act" approach is that all provisions and other features of the enactment must be given force, and provisions must be interpreted so as not to derogate from the force of other provisions and features of the whole statute. See generally ______________ Norman J. Singer, Sutherland Statutory Construction 47.02, at _________________________________ 120 (5th ed. 1992). A close analysis of section 952(a) reveals that the government's broad interpretation of clause 2 would both render clause 1 superfluous and make it technically impossible to violate. Furthermore, the analysis makes it clear that Congress considered the conduct at issue in this case and rejected proscribing it under the statute. First, clause 1 proscribes the importation of illegal drugs into the customs territory of the United States from a place outside the customs territory of the United States, but within the United States. The "customs territory of the United States" is defined as "the States, the District of Columbia, and Puerto Rico." See Harmonized Tariff Schedule of the United ___ States, n.2. Thus, clause 1 proscribes importation from any other U.S. territory not within the customs territory (e.g., U.S. ____ Virgin Islands, Guam) into "the States, the District of Columbia, and Puerto Rico." That Congress specifically addressed this situation suggests that it believed that the language of clause 2 did not necessarily cover such conduct. The government's broad reading of clause 2, however, brings any conduct conceivably addressed -19- under clause 1 within the coverage of clause 2. In other words, any contraband shipped from a place inside the United States (but not within the customs territory -- e.g., the U.S. Virgin ____ Islands) would first pass through international waters before it entered into the customs territory of the United States. Thus, the conduct aimed at under clause 1 would be proscribed by the government's interpretation of clause 2. Hence, the government's reading of clause 2 renders clause 1 completely superfluous. Second, the government's broad reading of clause 2 would make it arguably impossible to prosecute anyone under clause 1. Under the government's reading, the phrase "any place outside thereof" essentially means the point at which the drugs were located immediately before passing into the United States (i.e., the international space just outside the jurisdictional ____ limit of the United States). If one applies this reading to the same phrase in clause 1, it is impossible to violate clause 1. In other words, there is no "place" just outside of the jurisdictional limits of the customs territory of the United States, that is also within the United States. Any place that is just outside the customs territory of the United States is international waters. Thus, arguably no individual could ever violate clause 1 because no one could ship from a place within the United States (but outside the customs territory) directly into the customs territory of the United States: the individual would always be directly shipping from international waters. If a prosecutor attempted to charge a defendant under clause 1 for -20- shipping drugs from the U.S. Virgin Islands to Florida (conduct clearly meant to be proscribed by clause 1), the defendant could argue that he or she did not violate the clause because the "place" from which the drugs were imported was not the U.S. Virgin Islands but the international space just outside of Florida. Although the prosecutor could argue that the "place" referred to by the statute included both the international space and the U.S. Virgin Islands, such a reading would be hard to square with the gloss the government puts on the phrase under clause 2.7 Third, and perhaps most convincing, a close analysis of clause 1 reveals that Congress contemplated whether or not illegal drugs shipped from one part of the United States through international waters and back into the United States should be prohibited under 21 U.S.C. 952. Specifically, clause 1 evinces Congress' intent to proscribe such conduct in the certain instances in which drugs are imported into the customs territory  ____________________ 7 One could quibble here because national territorial waters extend farther than state territorial waters off any one state's coast. Thus, it is possible to argue that an individual could violate clause 1 by importing from the national waters (arguably, outside the customs territory, but inside the United States) into the state waters. However, the point fails to undercut our analysis in any significant way. In other words, even if "states" in the definition of customs territory extends only to the state jurisdictional waters (a point which we do not necessarily concede), it seems unlikely that in enacting clause 1, Congress was aiming only at drugs shipped from one state out into national waters and back into that or another state (as everything else that would violate clause 1 would fall within the government's broad interpretation of clause 2). Moreover, such a reading would be inconsistent with the general usage of the term "customs territory" in the Harmonized Tariff Schedule. -21- of the United States from a point in the United States but outside the customs territory. Clearly, Congress could have gone further and proscribed any shipment of drugs originating inside the United States that passed through international waters and entered back into the United States, but it did not. By explicitly limiting the statute to the conduct proscribed by clause 1, it is fair to infer that Congress did not intend to proscribe the additional conduct at issue in this case. The reason for this is clear. In enacting 952, Congress was attacking classic cases of importation, meaning international importation, not domestic transportation, of drugs.8 Thus, unlike the government's reading, the interpretation adopted by the en banc court both accords with the __ ____ plain language of the statute and gives meaning to section 952 as a whole act. However, even if such were not the case, the confusion that is patent even from the government's discussion of the statute brings into play the rule of lenity, and requires us to give defendants the benefit of the doubt on this issue. Ratzlaf v. United States, 114 S. Ct. 655, 663 (1994); McBoyle v. _______ _____________ _______ United States, 283 U.S. 25, 27 (1931) (Holmes, J.); United States _____________ _____________ v. Maravilla, 907 F.2d 216, 223 (1st Cir. 1990) (Breyer, C.J.). _________ B. Congressional Intent B. Congressional Intent  ____________________ 8 Cf. Llewellyn, 3 Vand. L. Rev. at 401 (concluding that courts ___ should adopt statutory interpretations that accord with "[t]he good sense of the situation" and that represent "a simple ______ construction of the available language to achieve that sense, by __ a tenable means, out of the statutory language" (emphasis in _ _____________ ___ __ ___ _________ ________ original)). -22- On the specific point at issue, there is no legislative history. Nonetheless, the dissent claims that Congress did not "care one whit whether the drugs were brought from international waters [or international airspace9] or from a foreign land, so long as they crossed the U.S. boundary." See dissent at 43. But ___ Congress might well be concerned whether the drugs were being brought from one place within the United States to another. The ______ ___ ______ ______ obvious fact that Congress may be generally presumed to oppose the drug trade neither renders the language in question ambiguous nor justifies its strained interpretation. Congress can be similarly presumed to oppose murder, arson and robbery, but we do not rely on such facts as justifying strained readings of statutes in those areas. We can find no legitimate reason to follow a different course here. C. The "Precedents" C. The "Precedents" As discussed, the interpretation urged by the government leads to unreasonable results. Turning to precedent,  ____________________ 9 We agree with the dissent's concessions to the effect that "[i]t is far from clear whether a scheduled non-stop airline flight between two U.S. points could ever be treated as importation under the main clause [of section 952]," and that "a defendant would certainly argue that for all practical purposes, drugs on such a flight are never outside the country." See ___ dissent at 39. This contention purportedly refutes our superfluousness argument, yet leaves unexplained the disappearance of the "transparent curtain" which Congress envisioned "around the boundaries of the United States," the penetration of which, bearing drugs, "is the crime [of importation]." We fail to see how a principled distinction can be made between such an incursion into international airspace, and the present case involving travel between "two U.S. points." The dissent's "yes if by water, no if by air" formula for installing its transparent curtain appears to respond to no statutory purpose identified by the dissent. -23- we see that the case law does not support the outcome proposed by the government. The government views precedent as carrying special weight in formulating its interpretation of 952(a). This is obviously a principle which we generally agree with, as far as it goes. However, the "precedent" on which the government relies, with one exception, is inapposite. The language cited from United States v. Peabody, 626 _____________ _______ F.2d 1300, 1301 (5th Cir. 1980) ("Had the cargo of contraband originated in Texas, that would not alter the fact that it was meant to reenter the United States from international waters. That is enough."), which is both the seminal authority for the cases that follow and the anchor upon which the government relies for its interpretation of 952(a), is particularly flawed. Although the cryptic statement in Peabody fits the government's _______ glove, a reading of that case clearly demonstrates that the proposition for which it stands is total dicta, and is not based on even a superficial analysis of the issues raised in the present appeal. Indeed that opinion does not even cite 952(a), although it may perhaps be surmised that such is the statute at issue. Nevertheless, nothing in the factual background of that case supports the proposition relied upon by the government. Without question the contraband in Peabody was not coming from _______ another domestic area in the United States, Texas or otherwise, and thus the court's hyperbole was pure dicta. Peabody and its _______ progeny constitute flimsy precedent upon which to hang one's hat. -24- In United States v. Phillips, 667 F.2d 971, 1033 (5th ______________ ________ Cir. 1981) (holding that the importation "element may be established by evidence that a boat from which marihuana was unloaded went outside United States territorial waters or met with any other vessels that had -- for example, a "mother ship"), the facts involved contraband brought directly from Colombia through motherships off Florida. Id. at 987. As in Peabody, the ___ _______ present issue was not decided and the quoted language is again dicta. In United States v. Lueck, 678 F.2d 895, 904-05 (11th _____________ _____ Cir. 1982), the Eleventh Circuit, relying on the specific language quoted from Peabody, rejected the contention that proof _______ of importing controlled substances from a specific point on foreign soil is required as an element of 952(a). Id. at 905. ___ However, Lueck's holding must be read and understood in light of _____ the fact that the airplane in question had been spotted first flying over the Bahamas. The record evidence in Lueck supported ______ _____ the finding of importation upon the airplane's entry into domestic airspace. Id. at 897. In stark contrast to Lueck, we ___ _____ do not have here any evidence supporting such a finding, rather, all we have is evidence that the illegal substance was brought from a place within the United States. United States v. Goggin, _____ _____________ ______ 853 F.2d 843, 845 (11th Cir. 1988), another case from the Eleventh Circuit, which relies on Lueck, also concerns a flight _____ from the Bahamas, id. at 844, 847, and is therefore different ___ from the present appeal. -25- In United States v. Doyal, 437 F.2d 271 (5th Cir. 1971) _____________ _____ (involving the predecessor statute to 952), the defendant contended that although he was caught entering the U.S. from Mexico with illegal drugs, he had in fact acquired the drugs in the U.S., taken them into Mexico, and brought them back; therefore, argued the defendant, he was not guilty of importation. Id. at 274-75. Although the drugs in question had ___ originated in the United States, the fact is that they were brought into Mexico, and it was from there that they entered the ______ _____________________ domestic territory of the United States. Id. at 272. Such an ___ entry from a foreign country (i.e., a "place outside" the United _______________ ____ _____ States) is not what we have before us. United States v. ______________ Friedman, 501 F.2d 1352 (9th Cir. 1974), also cited by the ________ government, involved another entry from a place outside the _____ United States -- Mexico as in Doyal. _____ Reliance on the language used by our Circuit in United ______ States v. Nueva, 979 F.2d 880, 884 (1st Cir. 1992), is equally ______ _____ unhelpful in the present situation. In Nueva, law enforcement _____ authorities spotted a suspect aircraft traveling from South America to Puerto Rico; the authorities tracked the plane to a point above the ocean off the coast of Puerto Rico, where it dropped bales of illegal drugs at a rendezvous point for a boat. Id. at 881-83. Picking up contraband by going into international ___ waters, id., stands on the same footing as going into a foreign ___ country to do so (i.e., Friedman, Doyal, Goggin, Lueck, Phillips, ____ ________ _____ ______ _____ ________ Peabody). We do not question that such a place from which the _______ _____ -26- defendant gains possession of the contraband, is "outside [the United States]," and thus, that the entry from such a place, into _____ the United States, meets that element of the importation charge in 952(a). We thus come to United States v. P rez, 776 F.2d 797 ______________ _____ (9th Cir. 1985). This is the only case which factually approximates the present one.10 There, an illegal load of marihuana was transported by boat from the Mariana Islands (a United States Trust Territory in the Pacific), through international waters to Guam, another U.S. domestic area. The court squarely holds that the transit through international waters is sufficient to sustain an importation charge under 952(a). It would perhaps have been helpful for present purposes, had the deciding court discussed the issue with some original analysis or some enlightening reasoning in support of its ephemeral conclusion, but such was not to be. The court merely "rounded up the usual suspects," by citing its Friedman ________ case (importation from Mexico), and Peabody and its progeny _______ (Lueck and Phillips), as being "instructive," id. at 801, without _____ ________ ___ providing much more to support the resolution of an issue which it had admittedly "never [before] addressed." Id.11 ___  ____________________ 10 A difference is that in the present case the two places are within the same jurisdiction, in fact the same municipality. See ___ footnote 1. 11 This is despite precedent such as United States v. Carri n, ______________ _______ 457 F.2d 200 (9th Cir. 1972), in which the Ninth Circuit ruled that evidence that an aircraft landed in Los Angeles with 404 pounds of marihuana, that it had used enough fuel and had enough time to go to Mexico, that the marihuana was in boxes marked in -27- Thus, the "precedent" cited amounts to bald assertions without analysis. D. Historical Application of the Statute D. Historical Application of the Statute Actions speak louder than words. In this case this old adage is not simply poetic expression, for the interpretation of 21 U.S.C. 952(a) promoted by the government is most certainly at odds with the government's past enforcement practices under this statute throughout its long life. It is difficult to accept that Congress intended the government's reading of 952(a), considering that this reading of the statute has somehow lain lifeless for 25 years until given breath in this case by the prosecution. The government would have us believe that throughout the life of this statute, which has been on the books in practically the same form since 1970, in every direct flight, commercial or private, between, say, the Mainland and Puerto Rico, or the Mainland and Hawaii or Alaska, or vice versa, or even between Miami and New York, or Nantucket, Massachusetts and Boston, etc., all of whom at some point (or, in fact, throughout most of their passage) fly within international airspace before returning to domestic territory, the occupants have always been subject to being charged under this hitherto overlooked definition of "importation." The government's novelty seems all the more striking in this Circuit, where notwithstanding the hundreds (perhaps thousands) of such daily _____  ____________________ Spanish, and that one of the passengers had a map of Mexico, as well as a match box from a Mexico motel, was not sufficient to ___ establish that the marihuana had been imported from Mexico! -28- flights, the government has somehow throughout these many years never pressed such a theory of importation. Is this attributable to prosecutorial benevolence or incompetence? Certainly not. What we have is the tacit recognition that such acts could not reasonably be considered "importation" within 952(a). "Whatever other statutes defendants may have violated, they did not violate this one." Maravilla, 907 F.2d at 223 (Breyer, C.J.) _________ (holding that custom agents who murdered a Dominican citizen who was temporarily in the United States did not violate civil rights statute because the victim was not an "inhabitant"). We have a similar situation with water-borne traffic. There are literally thousands of vessels of all sizes and with all kinds of purposes that daily pass through international waters as they move between domestic areas which, without picking up contraband in international waters or visiting foreign jurisdictions, would be subject to this expanded interpretation of 952(a). Not only is there the obvious marine traffic between the Mainland and its outlying domestic areas (Hawaii, Alaska, Puerto Rico, U.S. Virgin Islands, etc.), and the considerable coastwise traffic in the Atlantic, Pacific, Gulf and Great Lakes waters which as a matter of course continuously exits and reenters international waters. There are also hundreds of thousands of commercial fishermen, as well as those who fish for sport, who on a daily basis leave domestic waters, enter _____ international waters, and return to domestic waters, again without acquiring contraband in international waters or entering -29- foreign jurisdictions, who would be subject to the contested interpretation of 952(a). However, contrary to the government's assertions at oral argument, it does not stop here. For example, a passenger on a commercial whale-watching vessel who left Provincetown, Massachusetts, went thirteen miles offshore into international waters to watch these behemoths, and then reentered domestic waters would be subject to a charge of importation if he or she had drugs when he or she originally left Provincetown. A maritime worker traveling to and from an oil rig on international waters in the Gulf of Mexico off Louisiana, or on George's Bank off New England, would be equally exposed. A sailboat tacking up the coast would engage in an act of "importation" every time it reentered domestic territory, if it had contraband aboard when it tacked out of domestic territory. The height of absurdity,12 however, is that according to the government's interpretation as expressed at oral argument, the act of leaving domestic territory would in turn also be _______ considered an illegal exportation subject to charge under ___________ 952(a)'s companion provision, 953(a), even though there was no intention or act of visiting a foreign territory or off- loading the exported contraband onto a vessel in international waters. Thus, under this scenario, a sailboat tacking twenty times up the East Coast of the United States from Miami to New York, which had aboard illegal substances acquired in Miami,  ____________________ 12 See In re Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643 ___ ______________________________________ (1978) (holding that an absurd result militates against a proposed statutory interpretation).  -30- would be subject to being charged with twenty violations of exportation under 953(a), and twenty violations of importation under 952(a), one for each time it tacked out to and from international waters. As if the above scenarios were not ludicrous enough, at oral argument, the government also informed us that in the above situations, since international borders were crossed, border crossing rules are applicable, with all of the consequent diminished Fourth Amendment implications such circumstances bring into play. See United States v. Ram rez, 431 U.S. 606, 616-19 ___ _____________ _______ (1976) (holding that government's right to search all persons and their belongings who cross its borders is plenary and is "reasonable" per se within the Fourth Amendment); Carroll v. ___ __ _______ United States, 267 U.S. 132, 153-54 (1925) (stating that border _____________ searches require no probable cause); see also United States v. ________ ______________ Montoya de Hern ndez, 473 U.S. 531, 537-38 (1986) ("Routine ______________________ searches of persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant . . .").13 Clearly, the implications of the government's proposed interpretation go far beyond the mere crossing of a stretch of water between two points in the same municipality in Puerto Rico. Cf. Torres v. Puerto Rico, 442 U.S. ___ ______ ___________ 465, 474 (1978) (concluding no international border exists  ____________________ 13 Indeed, the Fourth Amendment issues here may be more troubling than in the land border cases, given the relative lack of notice upon entering the United States by water versus by land, since land borders are often marked.  -31- between Puerto Rico and continental United States). A passenger and his or her belongings on a Boston to Nantucket flight, which is partially over international waters and airspace, can be subjected hereafter to a border search upon arrival in Nantucket, as well as to another such intrusion upon returning to Boston. In light of these possibilities and in light of the fact that drug possession statutes already exist to address domestic ________ conduct,14 we cannot accept the government's reading of 952(a). By its interpretation of 952(a), the government has chosen to ignore a basic rule of statutory interpretation, one firmly imbedded in the jurisprudence of this Circuit: "[U]nreasonableness of the result produced by one among alternative possible interpretations of a statute is [a valid] reason for rejecting that interpretation in favor of another which would produce a reasonable result." United States v. _____________ Bayko, 774 F.2d 516, 522 (1st Cir. 1985) (quoting Sutherland, _____ Statutory Construction, 45.12 (4th Ed. 1984)). ______________________ Furthermore, the undeniable fact is that section 952(a) has not been used at all in the fashion now promoted by the ____________ prosecution. On this point, there should be no need to engage in  ____________________ 14 These real possibilities are not merely lurking Fourth Amendment problems to be resolved in future cases. Although obviously they are not at issue in this case, particularly in view of the Government's assertions at oral argument, they fall within the realm of consequences that will follow from the government's proposed interpretation of section 952(a), and are valid factors to be considered in determining whether Congress in enacting that statute intended the result espoused by the government. Needless to say, the mere possibility is extremely worrisome as nothing of this sort has ever occurred in the Nation's history. -32- speculation regarding whether or not there are other uncited or unreported prosecutions demonstrative of the government's view of 952(a). At oral argument, the government was specifically asked to produce evidence of such a prosecution. Nevertheless, the government has failed to cite even one case in this circuit, ___ at any level, reported or otherwise, in which a defendant was even charged, much less convicted, in the manner now claimed, nor has our own search revealed the existence of such a case. Considering the possibility that the government may not have prosecuted "small quantities" of drugs transported over international space from a prior United States connection as importation under 952(a), but that similarly transported large amounts have been considered violations of that provision, we conducted our own search of reported cases. The inquiry revealed that such a distinction simply does not exist. See, e.g., United ___ ____ ______ States v. Marcel, 1995 WL 732747, *1 (2d Cir. 1995) (discussing ______ ______ convictions of two co-conspirators who participated in the transportation of 48 kilograms of cocaine from Puerto Rico to New __ _________ York, but who apparently faced no charge or conviction for importation); United States v. P rez, 1994 WL 702058, *1-2 ______________ _____ (discussing suppression motion of two co-conspirators arrested with approximately 30 kilograms of cocaine shortly after arriving __ _________ at John F. Kennedy International Airport aboard a flight from San Juan; the two defendants faced a two-count indictment that did not include an importation charge). This court can take judicial notice of the substantial traffic in narcotics between Puerto -33- Rico and the mainland United States involving large amounts of contraband. See P rez, at *4 (describing San Juan, Puerto Rico ___ _____ as "a location known to [Organized Crime and Drug Enforcement Task Force] agents to be an active departure point for narcotics smuggling activities into New York"). Yet, we are unaware of any case in which the government has in fact charged that transporting the contraband from Puerto Rico to the mainland (or vice versa) constituted an importation violation under 952(a). Nor is the possibility of such forbearance by the government from prosecuting such cases in the future very reassuring. Cf. Donovan v. United States, 114 S. Ct. 873 (1994) ___ _______ _____________ (in light of Ratzlaf v. United States, 114 S. Ct. 655 (1994), _______ _____________ vacating and remanding First Circuit case that tried to uphold the prosecution of defendant pursuant to the money laundering statute even though defendant's structuring was merely an attempt to hide money from his wife in a divorce proceeding), vacating ________ United States v. Aversa, 984 F.2d 493 (1st Cir. 1993). Although _____________ ______ prosecutors should perhaps not be faulted for seeking to expand the limits of the law, courts cannot allow themselves to be caught up in this euphoria. Rather, they are duty bound to contain the government within established limits. The government's actions in not prosecuting such cases up to now are powerful evidence that Congress did not intend the interpretation now promoted by the government. Such lengthy non-action should not be glibly overlooked. -34- The government also claims that the interpretation set forth here would inordinately burden prosecutors by adding to their burden the obligation of identifying and proving the point of origin of drugs in smuggling operations. However, when a drug-laden ship coming from an unknown point of origin is shown to have traversed international waters and brought drugs into the United States, a jury could presume, without more, that importation from a place outside the United States has occurred - - although the precise place from which the drugs emanated is not established. Cf. Turner v. United States, 396 U.S. 398, 416 ___ ______ _____________ (1970) (approving statutory permissive inference that a person in possession of heroin is in knowing possession of an imported narcotic because of the "high probability" that the heroin originated in a foreign country); see also Ulster County Court v. ________ ___________________ Allen, 442 U.S. 140, 156-57 (1979); Leary v. United States, 395 _____ _____ ______________ U.S. 6, 46-47 (1969). In other words, the government can make out a prima facie case of importation, within the meaning of 21 U.S.C. 952(a), merely by showing that a ship carrying drugs from parts unknown has cruised international waters before entering the United States. Similar inferences would apply to the case of drugs off-loaded into this country from a mother ship located within international waters. We therefore hold only that a defendant can defeat an importation charge by demonstrating affirmatively by competent evidence that the drugs came into the United States directly from another place that is also within the United States. That is the case before us. The charge in the ____ ______ -35- present case, and the undisputed evidence presented by the ___________________ government is that the drugs were picked up in Mona Island (i.e., __________ ____ domestic U.S. territory) and brought to another place within U.S. domestic territory. The government never made out a prima facie case that the drugs came from a place outside the United States, _____ _______ as the statutory language requires. CONCLUSION CONCLUSION We affirm defendants' convictions on the possession counts. We also remand the issues surrounding the firearms convictions to the original panel for further proceedings in light of this opinion. This en banc decision determines, as a matter of __ ____ statutory interpretation, that the importation statute does not apply to the shipment in this case from one part of the United States and its customs territory (Mona Island, Puerto Rico) to another (the main island of Puerto Rico). We thus reverse the importation convictions of all three defendants. Accordingly, the judgment of the district court is affirmed in part, remanded in part, and reversed in part. ________________________________________________________ -36- CYR, Circuit Judge (concurring). I agree that the CYR, Circuit Judge (concurring). _____________ importation convictions must be vacated, as ably explained in Section III.A of Chief Judge Torruella's opinion for the en banc __ ____ court. I write separately because I believe that neither the majority opinion nor the dissent succeeds in demonstrating that the opposing result is absurd. Whichever result Congress clearly chose to require could not have been rejected by the courts as absurd. Moreover, in my view the interpretation given section 952 by the en banc court reflects greater allegiance to the __ ____ ordinary meaning of the statutory language Congress did use. "Dissenting" follows -37- BOUDIN, Circuit Judge, with whom SELYA and LYNCH, BOUDIN, Circuit Judge, with whom SELYA and LYNCH, ______________ Circuit Judges, join, dissenting. Dr. Johnson once remarked that Circuit Judges, join, dissenting ______________ a man may have a reason why 2 plus 2 equals 5 but it will still equal but 4. The majority has an endless supply of reasons why the statute does not mean what it says. But the majority's opinion defies the plain language of the statute; it contradicts uniform rulings in three other circuits; and it undermines the purpose and administration of the drug laws. In the majority's effort, scarcely a major canon of construction escapes damage. The evidence showed that the defendants collected 16 kilograms of cocaine hidden on Mona Island, an island under the jurisdiction of Puerto Rico but physically separated from mainland Puerto Rico by about 39 miles of water. Assuming a 12- mile limit for U.S. territorial waters, at least 15 miles of international waters separate Mona Island from mainland Puerto Rico. Any ship traveling between Mona Island and mainland Puerto Rico is unquestionably outside the United States for a good portion of the trip. In this case, the origin of the cocaine is unknown; but the ship's captain reported that it was part of a larger cache hidden on Mona Island. In all likelihood, Mona Island is a transhipment point. Being subject to less surveillance than mainland Puerto Rico, drugs can be brought to Mona Island in bulk from foreign origins and then smuggled in smaller quantities to the Puerto Rico mainland and then to the continental United States. In all events, the defendants were arrested after their -38- small boat crossed from international waters into U.S. waters surrounding Puerto Rico. The defendants were convicted of various offenses including violation of 21 U.S.C. 952(a) which prohibits the importation of specified drugs into the United States. Neither at trial nor on appeal did the defendants argue that their conduct fell outside section 952; but at oral argument, the parties were directed by the original panel to brief the statutory issue. Subsequently, the panel by a 2-to-1 vote held that section 952 did not reach the defendants' conduct. The panel majority's decision conflicted with a host of decisions in the Fifth, Ninth and Eleventh Circuits. Not surprisingly, the full court voted to rehear the case en banc. What is surprising is that, by a 4-to-3 vote, the en banc court has now concluded that section 952 does not apply to the defendants' conduct in bringing 16 kilograms of cocaine from international waters to mainland Puerto Rico. This result is wrong, and it does not take a treatise to show why. 1. "The starting point in statutory interpretation is 'the language [of the statute] itself.'" United States v. James, _____________ _____ 478 U.S. 597, 604 (1986). Section 952(a) says that it is unlawful "to import [specified drugs] into the United States from any place outside thereof . . . ." "Import" is given a special _______ definition for the illegal drugs subchapter: it is defined to mean "any bringing in or introduction of such article into any area . . . ." 21 U.S.C. 951(b). The prohibited area--the -39- United States--is defined to mean "all places and waters, continental or insular, subject to the jurisdiction of the United States." 21 U.S.C. 802(28). In this case, the defendants brought prohibited drugs from international waters between Mona Island and mainland Puerto Rico to within a mile or so of the mainland coastline, a point that is unquestionably within the United States. The drugs were, therefore, brought or introduced "into the United States" from "any place outside thereof," namely, international waters--unless "any place" has to be a land area or unless "import" has a specialized meaning excluding drugs first acquired within the United States. The phrase "any place outside thereof" assuredly includes international waters. See, United States v. Goggin, 853 ___ _____________ ______ F.2d 843, 845 (11th Cir. 1988). If drugs were manufactured on a ship at sea or found floating on a raft, and were then brought into shore by motorboat, that would be an importation from a place outside the United States. The juxtaposition of "places" and "waters" in section 802(28) was almost surely a precautionary redundancy. Adding "waters" to "places" avoids the chance that anyone might mistakenly read "places" to mean only dry land. The majority does not deny that international waters may be a "place" under the statute: it assumes that drugs acquired from a mother ship at sea might be imported under the statute; but it says that in this case defendants first acquired the drugs within the United States, i.e., on Mona Island. But ____ -40- the statute says nothing about where the defendants first acquired their drugs. Indeed, drugs "acquired" by a defendant in the United States but carried abroad can later be illegally re- imported. E.g., United States v. Friedman, 501 F.2d 1352, 1353- ____ _____________ ________ 54 (9th Cir.), cert. denied, 419 U.S. 1054 (1974) (transit _____________ through Mexico). As for the term "import," absent a statutory definition the common connotation of foreign-country origin might prevail. But courts are bound, Coluatti v. Franklin, 439 U.S. 379, 392 ________ ________ n.10 (1979), by Congress' special definition of "import," _______ incorporated into section 952 by section 951(b), defining "import" in relation to destination, not origin. E.g., United ____ ______ States v. Peabody, 626 F.2d 1300, 1301 (5th Cir. 1980). This ______ _______ definition applies "whether or not such a bringing in or introduction constitutes an importation within the meaning of the tariff laws of the United States." 21 U.S.C. 951(a)(1). In a further language argument, the majority suggests that its reading of section 952 is supported by a comparison of subsection (a)'s two clauses. The main clause, barring imports "into the United States," is the core provision whose substance can be traced back to 1909. The other clause--added in a 1970 recodification of drug laws--covers imports into U.S. customs territory (the states, the District of Columbia and Puerto Rico) from any U.S. possession. The majority contends that, on the government's reading of the main clause, the customs territory clause is superfluous and has no independent effect. -41- The origin and purpose of the customs territory clause are remarkably obscure (it appeared only in certain House bills and was nowhere explained). But it is fair to think that smuggling from some U.S. possessions to the states had become a problem and Congress therefore included language that would unquestionably cover such shipments. At the time Congress had no knowledge of precisely how the main clause would be read, and it certainly had no interest in narrowing the scope of the main clause by implication. In any event, the customs clause is neither superfluous nor without substantial independent application. It is far from clear whether carrying drugs aboard a scheduled non-stop airline flight between two U.S. points could ever be treated as importation under the main clause; a defendant would certainly argue that for all practical purposes, drugs on such a flight are never outside the country. Yet such a flight from a U.S. possession to U.S. customs territory, say from Guam to Los Angeles or from the U.S. Virgin Islands to San Juan, could readily be prosecuted under the customs territory clause. That geographic content to the customs clause eliminates the majority's superfluousness argument. It is not the government's position, but that of the majority, that ruptures the superfluousness canon. Under the special definition of import in section 951(b), Congress envisaged a kind of transparent curtain around the boundaries of the United States, and bringing drugs through that curtain is the -42- crime. The majority has effectively repealed and rendered meaningless Congress' specialized definition, replacing it with a vernacular definition of import that requires no statutory definition at all. 2. The precedents from other circuits, reflecting a previously uniform application of the statute, all treat the ___ introduction of drugs from international waters or international airspace as a violation of the import statute.15 This has been the consistent position of the Fifth Circuit, the Ninth Circuit and the Eleventh Circuit, the three circuits whose area of jurisdiction includes the entire Pacific and Gulf coasts of the United States. Until this case, no circuit has taken the __ contrary view. For example, in affirming a conviction based on a shipment intercepted in Florida waters, the Fifth Circuit in Peabody stated: _______ Had their cargo or contraband originated in, say, Texas, that would not alter the fact that it was meant to reenter the United States from international waters. That is enough. 626 F.2d at 1301. In Goggin, the Eleventh Circuit said that it ______ was importation to bring cocaine "into the country from international waters or from airspace in excess of twelve  ____________________ 15 See United States v. Peabody, 626 F.2d 1300 (5th Cir. 1980); ___ _____________ _______ United States v. Phillips, 664 F.2d 971, 1033 (5th Cir. 1981), ______________ ________ cert. denied, 457 U.S. 1136 (1982); United States v. P rez, 776 ____________ _____________ _____ F.2d 797 (9th Cir. 1985); People of Territory of Guam v. _______________________________ Sugiyama, 846 F.2d 570, 572 (9th Cir. 1988), cert. denied, 490 ________ ____________ U.S. 1010 (1989); United States v. Lueck, 678 F.2d 895 (11th Cir. _____________ _____ 1982); United States v. Goggin, 853 F.2d 843 (11th Cir. 1988). _____________ ______ -43- geographical miles outward from the coast." Goggin, 843 F.2d at ______ 845. The Ninth Circuit in P rez likewise deemed "transit through _____ international waters" a basis for importation. 776 F.2d at 800- 01. Moreover, as the quote from Peabody shows, the circuits _______ treat the U.S. origin of the drugs as no defense if the drugs are removed from the United States and then reintroduced. Similarly, in United States v. Doyal, 437 F.2d 271, 275, (5th Cir. 1971), ______________ _____ involving a predecessor to section 952, the court flatly rejected the defense that the re-imported drugs had originated in the United States, saying: "[e]ach time the drug was imported into the United States a violation would occur." See also Friedman, _________ ________ 501 F.2d at 1354. Cases like Peabody and Doyal also underline a major _______ _____ fallacy in the majority's opinion, namely, the majority's assumption that a drug shipment can only come from one "place." It is evident that the defendants in this case possessed the drugs both on Mona Island and, thereafter, in international ____ waters. But it was from international waters that the defendants finally "[brought] in or introduc[ed] . . . such articles into" the United States, 21 U.S.C. 951(b); and reimportation is not a defense to drug smuggling. The present decision actually contradicts precedent in a fourth circuit as well: In United States v. Nueva, 979 F.2d _____________ _____ 880 (1st Cir. 1992), cert. denied, 113 S. Ct. 1615 (1993), the ____________ defendants, located in a boat in international waters, retrieved -44- packages of cocaine dropped from a plane. This circuit in Nueva, ____ _____ quoting Goggin, ruled that "importation" into the United States ______ under section 952 "requires proof that the 'defendant [conspired to bring] cocaine into the country from international waters or airspace in excess of twelve geographical miles outward from the coastline.'" Id. at 884. ___ The majority's answer to all of these cases is that the decisions of other circuits are ill-reasoned, or that their plain language--adverse to the dissent--was unnecessary, or both. But none of the many different judges who participated in these decisions apparently thought the statute should be read as the majority reads it. As of today, a major criminal statute means one thing in the 15 states of the Fifth, Ninth and Eleventh Circuits; and it means something eccentrically different in four Northeastern states and Puerto Rico. This parade of appellate cases from other circuits is surely only a sample of similar prosecutions and convictions; there must certainly be others where, as here, the defendants were convicted for importing drugs from international waters and then did not choose to dispute the import charge on appeal. By themselves, the authorities from three circuits refute the majority's claim that the government's reading of the statute is newly minted or at odds with enforcement practices. The only novelty in this case is the majority's decision. 3. A final test of statutory meaning is the underlying purpose of the statute. Borella v. Borden Co., 145 F.2d 63, 64 _______ __________ -45- (2d Cir. 1944) (L. Hand), aff'd, 325 U.S. 679 (1945). Congress' _____ interest in protecting U.S. borders echoes through the history of ____________ the statute. In proposing the legislation, the President's special message said that the import provisions were intended "to intercept [drugs] at their point of illegal entry into the United States," and there are numerous references--by the President, from law enforcement witnesses, and by legislators--to guarding the nation's "borders" against drugs.16 The legislators had no reason to care one whit whether the drugs were brought from international waters or from a foreign land, so long as they crossed the U.S. boundary. Indeed, Congress' indifference to origins is reflected three times over: in its expressed purpose to protect our "borders," in the expansive phrase "from any place outside thereof," and in a companion statute making it unlawful for anyone to possess prohibited drugs on board a vessel "arriving" in the United States unless manifested as cargo or official supplies. 21 U.S.C. 955. It was irrelevant to Congress' purpose whether the drugs were originally produced within the United States, as might matter under a tariff statute designed to protect U.S. markets  ____________________ 16 1969 Public Papers of the Presidents of the United States 513 ____________________________________________________ (Presidential message); Hearings on Legislation to Regulate _______________________________________ Controlled Dangerous Substances and Amend Narcotics and Drug Laws _________________________________________________________________ Before the House Ways and Means Committee, 91st Cong., 2d Sess. __________________________________________ 205 (1970) (statement of the Director of the Bureau of Narcotics and Dangerous Drugs); id. at 322 (statement of Representative ___ Pepper). -46- from foreign competition and to favor local producers. In enacting section 952, Congress was using the border crossing as a convenient jurisdictional hook on which to catch traffickers. See Peabody, 626 F.2d at 1301. Thus, the statute is violated ___ _______ where drugs are produced within the United States, carried to a foreign country and then reintroduced into this country. Accord ______ Friedman, 501 F.2d at 1353-54; cf. Hearings, supra, at 205 ________ ___ ________ _____ (reintroduction of drugs after export). In smuggling operations a boat arriving from international waters, or a small plane from international airspace, often comes from an unknown point of origin. If one added to the government's burden of proof the obligation to show the point of origin, time would be spent by courts and parties on an issue wholly irrelevant to Congress' concern to exclude drugs. In many cases, the government would win; in some it might lose. Such proof serves no purpose except to waste time, squander law enforcement and judicial resources, and cause occasional erratic acquittals of drug importers. To suggest that Congress could not have intended the statute to apply, the majority summons up visions of federal agents arresting day sailors or airline passengers transiting from one U.S. point to another with a few joints of marijuana on board. But such dubious results are not avoided by distorting the statute: a day hiker with a few joints who strayed over the border to Canada and then back again or a tourist with a few -47- joints returning from London by plane would be importing by any definition. More to the point, there is no record of prosecutorial abuse of section 952. Indeed, the majority twists this fact into a claim that the government's interpretation must therefore be a radical change in position, but the majority has confused two different points. The government has not abused the statute by applying it to trivial amounts for personal use; but it has applied it to major drug shipments arriving from international waters or international air space. As the precedents show, it has been upheld in every reported case. The courts are capable of warding off unjust results, if and when they arise. E.g., United States v. Aversa, 984 F.2d ____ _____________ ______ 493 (1st Cir. 1993), vacated, 114 S. Ct. 873 (1994). But such _______ surgery is properly done with a scalpel rather than an axe, and there is no cause for any surgery here. In this case, the ____ defendants were not day sailors or tourists; they were importing 16 kilograms of cocaine into Puerto Rico after a substantial trip through international waters. They fall squarely within the purpose, as well as the plain language, of section 952. The rule of lenity has nothing to do with such a case. To conclude: The majority opinion is not short of "reasons" for its result; after many pages of argument, one emerges half-dazed from the labyrinth of explanations. But nothing the majority says can overcome a single phrase in the statute--section 951(b)'s definition of "import" as "any bringing -48- in or introduction" of drugs into the United States. That is what the defendants did in this case, and that is why their convictions under section 952 should be affirmed. -49-