UNITED STATES of America,
Plaintiff-Appellee,

v.

Arthur Mitchell LUECK,
Defendant-Appellant.

No. 80–5898.

United States Court of Appeals,
Eleventh Circuit.

June 14, 1982.

Arthur W. Tifford, Melvyn Kessler, L. Mark Dachs, Miami, Fla., for defendant-appellant.

Elizabeth A. Jenkins, Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before FAY, VANCE and ARNOLD *, Circuit Judges.

FAY, Circuit Judge:

The appellant, Arthur Mitchell Lueck, seeks to overturn his conviction for importation into the United States of approximately sixty pounds of marijuana and forty-five pounds of methaqualone, in violation of 21 U.S.C. §§ 952(a), 960, and for possession with intent to distribute marijuana and methaqualone, in violation of 21 U.S.C. § 841(a)(1), on the grounds, *inter alia*, that the trial judge improperly denied his motion to suppress the evidence and statements seized at the time of his arrest. Our appellant's fate, alas, is less fortunate than his name; after careful consideration, we reject Mr. Lueck's challenge.

I. THE FACTS: A Borderline Case

On the evening of March 20, 1980, Customs Air Officer Gary Grahn was on duty at the Air Traffic Control Center of the Federal Aviation Agency [FAA], in Miami, Florida. Officer Grahn's task was to survey the skies, by means of radar, in search of aircraft entering the United States in violation of Customs regulations. At approximately 8:25 p. m., Officer Grahn spotted the appellant's plane on radarscope at a point outside the United States, thirty-sev-

* Honorable Richard S. Arnold, U. S. Circuit Judge for the Eighth Circuit, sitting by designation.

en miles north northeast of Bimini. The craft, which was travelling in a north, northwesterly direction, was not emitting a transponder code [1] and had not filed a flight plan, as mandated by FAA regulations. These violations, coupled with the plane's flight above open waters at night, aroused Customs Officer Grahn's suspicion. He sought immediate dispatch of a United States Customs Service chase plane to intercept and identify the craft. Officer Grahn maintained continued radar surveillance of the target until it was approximately ten miles east of Vero Beach.

Meanwhile, Customs pilots aboard the dispatched chase plane were able to identify the target as a single-engine, home-built, experimental aircraft known as a "Veri-Eze." The Customs plane tracked the Veri-Eze continuously on radar until a point above Titusville, Florida. By this time, approximately 9:40 p. m., a second Customs chase plane, manned by Customs Pilot Douglas Fults and Radar Operator, Customs Air Officer Dale Harper, had spotted the target. Aside from an interval of one to three minutes, the latter craft tracked the Veri-Eze without a break until its landing at about 9:50 p. m. at the Titusville-Cocoa Airport. Pursuing the target, the second chase plane landed at the same airport at 9:52 or 9:53 p. m.

Officers Fults and Harper proceeded at once to a hangar area which the Veri-Eze had been observed entering. Running down the row of hangars, Officer Harper found the Veri-Eze standing before an open, unlit hangar. The appellant emerged from the hangar and approached Officer Harper, who identified himself and displayed his badge. Harper's single gun was at all times pointed downward, away from Lueck; Harper at no time placed his finger on the trigger. Harper questioned Lueck as to the origin of his flight; after Lueck responded that he had come from South Carolina, Harper revealed that he had

tracked the plane from outside the United States until its landing in Titusville. Harper then observed a Dodge Colt automobile within the hangar. The left front door of the car was open. In view of the conflict between Lueck's responses and Customs observations, Harper asked the appellant if he would accompany him to discuss the matter further with additional Customs personnel. Lueck acquiesced. Before the two men left the hangar area in search of additional Customs officers, Harper asked Lueck if the latter possessed any valuables in the craft which he wished to secure. Lueck freely responded that he had already placed a briefcase and jacket inside his automobile. Lueck then closed the canopy of the Veri-Eze. The two proceeded around the corner, approximately 100 feet from the hangar, where they met Officer Fults. The three men spoke for an additional five minutes before returning together to the hangar area.

At 10 p. m., another Customs craft landed at the airport. Morris Helgeson, a Customs pilot aboard the newly-arrived plane, questioned Lueck again regarding the origin of his flight. After receiving the same response as Officer Harper, Helgeson told Lueck that he had been tracked from foreign air space. Despite this, Lueck maintained that he had come from the Florida Keys, where he had visited a woman he wished not to involve. When queried as to why he had been flying so far out at sea, Lueck replied that he wished to avoid the T-Terminal C-Control Area in Miami.

Helgeson next advised Lueck that because he had crossed from foreign to domestic airspace without stopping to obtain a Customs inspection, a search would now be conducted of both the craft and the vehicle. Lueck's response was, "Fine, go ahead." Helgeson shone a flashlight into the craft's closed canopy, but detected no cargo. At this point, Harper informed Helgeson of

---

1. A transponder is an electronic device which enables air controllers to locate, identify and monitor aircraft. It operates by returning "a signal to the radar site. The radar site will emit a frequency signal. It will reflect or will

bounce off the aircraft and send a signal back to the radar site, which will then interpret it and display it on a screen." Testimony of Customs Officer Gary B. Grahn, R. Vol. III at 7.

Lueck's statement that he had transferred a flight jacket and briefcase from the Veri-Eze to the automobile. Helgeson walked over to the car. Reaching through the open door, Lueck retrieved for Helgeson the jacket and case. Helgeson peered into the car and observed no bulk cargo. After Helgeson stated, "Let's look in the trunk," Lueck complained that it was very difficult to open. Helgeson persisted in his request, suggesting that they try to open it. Lueck took a key from his pocket and placed it in the trunk lock, which opened immediately and without any difficulty. No sooner did the trunk open, however, than Lueck closed it. At Helgeson's request, Lueck opened the trunk a second time. Again, the trunk opened at once, and again Lueck shut it quickly. After unlocking the trunk yet a third time, Lueck finally let the trunk remain open.

The trunk contained three packages wrapped in heavy brown paper: One was a cardboard box; the remaining two were round packages. All were labeled "Fragile—Handle with Care" and contained return addresses of "J & J Electronics, North Carolina." One package was addressed to R. B. Johnson at an illegible street and city location. The remaining packages contained no forwarding addresses.

Asked what the packages contained, Lueck answered, "Ceramic parts." Helgeson smelled a heavy odor emanating from the packages which, from his experience in drug work, had taught him was that of marijuana. Helgeson stated that the packages did not smell like ceramic parts. Lueck agreed, maintaining that someone had set him up. Helgeson disputed the likelihood of a set-up, given the fact that both the trunk and hangar had been locked. After Helgeson closed the trunk, Lueck was given his *Miranda* warnings and placed under arrest.

On request, Lueck removed the cardboard box from the trunk. Officer Helgeson opened it and saw inside a plastic bag containing white pills. Helgeson told Lueck that he smelled marijuana in the airplane as well. After Lueck opened the craft's cano-py, Helgeson decided to keep it closed. Customs officers seized the craft and vehicle later that night. The remaining evidence, including the cardboard box containing the white pills and the two additional packages recovered from the trunk, were given to agents of the Drug Enforcement Administration [DEA] at the scene, who took them to the DEA's Orlando office. That same night, the interior of the airplane was examined by a crime lab technician searching for prints and residue. A small amount of green leafy material was found in the rear cockpit. The residue, along with approximately fifty-four pounds of green leafy material contained in the two round packages found in the car trunk, were analyzed the next day by DEA chemists. The test confirmed what Officer Helgeson had determined at the airport, based on the packages' unmistakable smell: They contained marijuana. The white pills taken from the cardboard package were found to constitute forty-one pounds of methaqualone.

Both the craft and vehicle were registered in the name of the appellant, who is a certified pilot and 50 year-old engineer. The Veri-Eze craft seats two people, contains almost $50,000.00 worth of equipment and is sufficiently large to accommodate the three packages found in the car trunk. The hangar space where the vehicle and craft were parked on the night of the incident in question were leased to Lueck. The lease's prohibition against subleasing, as well as the management's lack of a key to the hangar space when leased and its periodic checking to make certain the hangar remained locked, assured Lueck's sole access to and control of the hangar space.

Prior to his trial on charges of drug importation and possession, the appellant moved to suppress the evidence found in the trunk and aircraft, as well as his pre-arrest statements. The trial court denied the motion, finding that *Miranda* warnings were properly given and that the warrantless search did not violate the fourth amendment. After his trial, the appellant was convicted on both counts of the indict-

ment. He was sentenced to concurrent terms of two years' imprisonment on each count, along with a special parole term of two years. In addition, a fine of $5,000.00 was imposed as to Count One.

## II. THE LEGAL CHALLENGE

### A. *Motion To Suppress*

#### 1. Pre-Arrest Statements

The appellant attacks the trial court's denial of his motion to suppress statements which he made to Customs officers prior to his arrest, on the grounds that they were obtained in violation of his constitutional right to *Miranda* warnings.

The universally recognized mandate of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 16 L.Ed.2d 694 (1966), requires police to afford any individual who has become the object of custodial interrogation specific warnings regarding his or her right to counsel and to remain silent.[2] These warnings ensure compliance with the fifth amendment's guarantee that no person may be required to incriminate him or herself. *Id.* at 444, 86 S.Ct. at 1612.

■ Interrogation at the border constitutes one notable exception to the constitutional protection of *Miranda*. Because of the overriding power and responsibility of the sovereign to police national borders, the fifth amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry to the United States. Hence, individuals arriving in this country are not entitled to *Miranda* warnings. *United States v. Gray*, 659 F.2d 1296, 1301 (5th Cir. 1981); *United States v. Warren*, 578 F.2d 1058, 1070 (5th Cir. 1978) (en banc), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980).

■ We concur fully in the trial court's conclusion that the questioning of the appellant following his debarkation at the Titusville-Cocoa Airport constituted a permissible border search. Under the authority of the Fifth Circuit's recent ruling in *United States v. Stone*, 659 F.2d 569 (5th Cir. 1981), the search of an individual or object which has been continuously tracked from outside the United States to its first domestic landing point is proper as a border search:

> Where an airplane or, for that matter, a person, vessel, object or vehicle has been sighted over foreign land, air or water and has been monitored continuously thereafter as it crosses the boundary of this country, its inspection by Customs at the first point it touches land is fully valid as a border search. Neither probable cause nor reasonable suspicion of criminal activity is necessary to validate such a search. Its justification derives from the single fact that the boundary of the United States has been crossed, since

**2.** Mr. Chief Justice Warren, writing for the Court in *Miranda*, set forth the following mandate:

> Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his *freedom of action in any significant way*. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any ques-

tioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any state of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

384 U.S. at 444–45, 86 S.Ct. at 1612.

"the object under such surveillance 'brings the border with it' to the point of search." *United States v. Johnson*, 588 F.2d 147, 154 (5th Cir. 1979) (citing *United States v. Brennan*, 538 F.2d 711, 715 (5th Cir.), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977).

*Id.* at 572.

Lueck's aircraft was subject to continued visual and radar surveillance from a spot outside the United States to its landing at the Titusville-Cocoa Airport. The appellant does not contest the legitimacy, as a border inquiry, of questions regarding the origins of his flight which were posed at his first domestic landing point. What Lueck does contend is that the Customs officers' ongoing queries surpassed reasonable questioning and entered the realm of custodial interrogation, triggering *Miranda*.

■ Judicial analysis of whether custodial interrogation warranting the safeguard of *Miranda* warnings has occurred is guided by consideration of the following four factors: (1) whether there existed probable cause for the defendant's arrest; (2) the subjective intent of the officers as to whether they considered the defendant at liberty to leave the investigation site; (3) the defendant's subjective belief regarding his freedom to leave; and (4) whether the defendant had become the focus of the investigation. *United States v. Del Soccorro Castro*, 573 F.2d 213, 215 (5th Cir. 1978). No single element is dispositive of a *Miranda* violation; neither must all of the above be present to find that there has been custodial interrogation. *United States v. Jordan*, 557 F.2d 1081, 1083 (5th Cir. 1977). Rather, evaluation of these "compulsive factors," *id.* at 223, is accomplished on a case-by-case basis. *United States v. Montos*, 421 F.2d 215, 223 (5th Cir. 1970). Based on his examination of the four pertinent factors in the instant case, the trial judge found that Lueck had not been "in custody" for *Miranda* purposes. After a full review, our conclusion mirrors that reached by the district court:

■ (1) Probable cause for arrest—Unless an individual has become the focus of official investigation seeking to elicit incriminating information, *Miranda* warnings are not required until there is probable cause for arrest. *United States v. Jordan, supra; United States v. Golden*, 532 F.2d 1244, 1246 (9th Cir. 1966). Probable cause is present where "the facts and circumstances warrant a prudent man in believing that an offense has been committed." *United States v. Henry*, 604 F.2d 908, 916 (5th Cir. 1979) (citing *Henry v. United States*, 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959)).

While reason existed to detain the appellant, based on his probable violation of civil regulations in failing to adhere to required procedures of flight and landing, Lueck himself concedes that no probable cause to arrest him arose until the actual discovery of contraband in his car trunk. As the court noted in *United States v. Henry*, 604 F.2d 908 (5th Cir. 1979), "Suspicion and even 'strong reason to suspect' is not adequate to establish probable cause." *Id.* at 916. Moreover, as explained in our discussion, *infra*, Lueck had not become the focus of an investigation prior to the finding of illicit drugs in his car trunk. Once this cache was discovered, probable cause to arrest the appellant arose; at that point, the officers properly read Lueck his *Miranda* rights.

(2) Subjective intent of the officers—The Customs officials required Lueck to identify himself, where he had come from and whether he had any valuables which he wished to secure. These innocuous questions amounted to no more than routine investigation which the officers were duty-bound to pursue. At the suppression hearing, Customs Officers Harper and Helgeson both testified that their motivation in questioning Lueck was to ascertain the origin of his flight and the reason he had failed to clear Customs upon entering the United States. While harboring a legitimate suspicion that Lueck might have been engaged in importing contraband, the officers by no means intended to arrest him. Not one question was asked of the appellant regarding whether he was carrying controlled sub-

stances. If anything, their more immediate suspicion was that of the appellant's failure to obtain Customs clearance, which constitutes a civil violation of Title 19 of the Code of Federal Regulations.[3]

(3) The defendant's subjective belief—the appellant did not testify at the suppression hearing. His subjective belief, therefore, may be inferred from the circumstances surrounding the airport inquiry. A 50 year-old engineer, the appellant projected an air of easy-going confidence. He gave no indication of being either nervous or particularly concerned during the course of his questioning. Moreover, no questions were put to him regarding drug smuggling, nor were any physical threats, restraints or force directed against him. The only visibly armed agent, Officer Harper, retained his weapon at his side, pointed away from the defendant, and at no time placed his finger on the trigger. These factors militate against a finding that Lueck subjectively believed his freedom was significantly restrained.

(4) Focus of the investigation—The purpose of the official questioning is relevant to the determination of whether an individual has become the focus of the investigation. *United States v. Henry*, 604 F.2d 908 (5th Cir. 1979). At no time did the officers demonstrate an underlying motivation to obtain inculpatory evidence from the appellant. Prior to the actual discovery of the drugs and Lueck's ensuing arrest, the officers did not even broach the subject of whether he had brought contraband or dutiable merchandise into the United States. The search of the car and aircraft was undertaken because of the appellant's insistence that he had not come from beyond United States territory, an assertion in direct conflict with the officers' visual and radar observations.

Lueck's reliance on *United States v. Del Soccorro Castro*, 573 F.2d 213 (5th Cir. 1978), and on *Alberti v. Estelle*, 524 F.2d

1265 (5th Cir. 1975), to prove that he had become the focus of the investigation during his pre-arrest questioning is misplaced. In the former case, the challenged inquiry occurred *after* the discovery of the drugs. In the latter case, the questioning of a stewardess wearing unusual shoes was prompted entirely by the authorities' knowledge that similar shoes had been used to carry contraband. Their motivation was entirely to obtain evidence of drugs which would incriminate the interrogated stewardess. Clearly distinguishable is the instant case, where questioning of Lueck *sans Miranda* warnings was pursued prior to any knowledge on the part of Customs officers as to his importation of narcotics. Once drugs were recovered, Lueck was immediately afforded his constitutional *Miranda* rights.

The Fifth Circuit rejected a similar challenge in the closely analogous case of *United States v. Henry, supra*. The defendant, who was a passenger on a flight from abroad, was queried by two separate inspectors when he presented suspicious documents. Recognizing that the essence of *Miranda* is the need to protect against self-incrimination, the Fifth Circuit noted that the purpose of the interviews was to determine whether further investigation was warranted, rather than merely to elicit incriminating information. On that basis, the court ruled that custodial interrogation dictating the right to *Miranda* warnings had not occurred until an actual violation, that of the defendant's false and willful representation of himself as an American citizen, was revealed by his admission to being a citizen of Jamaica. These circumstances parallel the case at bar, where the suspicious nature of the flight, coupled with the appellant's incredulous contention that the plane had taken off from South Carolina, gave Customs Officer Harper ample justification to initiate and continue the inter-

**3.** The Code of Federal Regulations provides that all aircraft entering the United States must land at an international airport. Any pilot seeking to land the craft at a different site must secure prior approval of the Federal Aviation Agency. Alternatively, the pilot may obtain prior Customs clearance for crossing an international boundary. 19 C.F.R. §§ 6.2, 6.3, 6.14 (1975).

view. Not until contraband was discovered did the routine questioning become focused on the appellant, sparking Lueck's right to *Miranda* warnings, which he was promptly afforded.

Far different was the interrogation in *United States v. McCain*, 556 F.2d 253 (5th Cir. 1977), a case relied on by the appellant. In *McCain*, the sole motivation of the Customs interrogator was to exert psychological pressure on the defendant which would cause her to confess that she had secreted drugs in her body. His warning to her that any narcotics she might be concealing on her person posed an immediate physical danger to her in no way resembles the conduct of the authorities who questioned Lueck. The latter officers never once referred even to the possibility that Lueck might be carrying drugs or merchandise subject to duty.

In light of the absence of any of the above four elements indicative of pre-arrest custodial interrogation, we conclude that the appellant was subjected to no more than a proper border inquiry, meriting no entitlement to *Miranda* warnings.

## 2. Discovery of Contraband

In addition to his unsuccessful move to suppress his pre-arrest statements, the appellant sought to suppress the marijuana and methaqualone found in three packages retrieved from his car trunk, on the grounds that the search violated the fourth amendment. The trial court rejected Lueck's argument, finding that the examination of the automobile was valid as part of the border search.

As noted above, the appellant's aircraft, which had been continuously tracked as it crossed from foreign to domestic airspace, was properly subject to a border search at the Titusville-Cocoa Airport, its first domestic landing place. *United States v. Stone, supra.* Because some of the contents of the craft which had crossed the border were transferred to the appellant's auto upon his first landing in the United States, the car constituted an extension of the airplane. Consequently, the vehicle, like the craft, was also subject to a border search.

■ Customs officers possess authority to search vehicles for evidence of contraband or dutiable merchandise even where the vehicle itself has not crossed the border, as long as reason exists to believe that the vehicle has come into contact with someone or thing which has crossed the border and the object of the search has been closely surveyed to the point of search. *United States v. Johnson*, 588 F.2d 147 (5th Cir. 1979); *United States v. Fogelman*, 586 F.2d 337 (5th Cir. 1978); *United States v. Brom*, 542 F.2d 281 (5th Cir. 1976); *United States v. Arroyave*, 477 F.2d 157 (5th Cir. 1973); *United States v. Hill*, 430 F.2d 129 (5th Cir. 1970).

■ *United States v. Johnson, supra,* articulates a more rigorous version of this general rule. To validate the warrantless search of a vehicle which itself has not crossed the border, a preponderance of evidence must prove that the object of the search has crossed the border. *Id.* at 155. Testimony at the suppression hearing revealed that Lueck's airplane and car were only a few feet away from each other; the front door of the car, located in the airplane hangar, was open, indicating that someone or thing had recently entered it; and, significantly, the appellant himself volunteered the statement that he had transferred his coat and briefcase from the craft. An odor of marijuana emanated from both the craft and packages found in the trunk; in addition, the packages of methaqualone and marijuana were similarly wrapped. Further connecting the airplane and car parked inside the hangar was the fact of appellant's exclusive control over the hangar space as its lessee. The hangar was kept locked at all times by airport management, who themselves did not possess a key to the hangar.

■ The above factors establish a nexus between the craft seen to have crossed the border and the nearby auto sufficient to satisfy the heightened preponderance of evidence standard announced by *Johnson*. Accordingly, we affirm the trial court's de-

termination that the search of the car constituted a valid border search.

After retrieving the three packages from the trunk, Customs Pilot Helgeson opened one and discovered methaqualone. Based on the foregoing discussion, the search of the trunk and the package of methaqualone were clearly proper as a border search. The remaining two packages which were removed by DEA agents called to the scene by Customs officials, were opened the following morning at the DEA office in Orlando. Although statutory authority to conduct border searches is entrusted to Customs agents, the Fifth Circuit has expressly validated border searches conducted by officials of other agencies whose investigation has been coordinated with Customs officers. See *United States v. Ivey*, 546 F.2d 139, 144 n. 1 (5th Cir. 1977); *United States v. Warren, supra.*

■ At the point marijuana was smelled by Officer Helgeson, probable cause to believe a crime had been committed, namely the importation and possession of contraband, arose. Even assuming, without deciding, that the delay in opening the two packages until the next day may have taken their examination beyond the scope of an actual border search, we find that a warrant was not necessary to validate the later examination at DEA headquarters. A line of Supreme Court cases, ending most recently with *Robbins v. California*, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981),[4] stands for the proposition that a closed opaque container found in a vehicle subject to a warrantless search cannot itself be searched unless the authorities first obtain a warrant. This holding is grounded in the greater expectation of privacy associated with personal luggage as opposed to vehicles. *See Arkansas v. Sanders*, 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979); *United States v. Chadwick*, 433 U.S. 1, 13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977). Exempt from the warrant requirement, however, are containers whose contents are obvious:

> Not all containers and packages found by police during the course of a search will deserve the protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain view", thereby obviating the need for a warrant.

*Arkansas v. Sanders, supra.* See also *Robbins v. California, supra*, 453 U.S. 420, at 427, 101 S.Ct. at 2846, 69 L.Ed.2d 744, at 751–752.

Contents of the packages found in Lueck's briefcase were, in the words of the court in *Arkansas*, "by their very nature" inferrable. *Id.* at 762, 99 S.Ct. at 2592. Customs Pilot Helgeson testified that the three packages reeked of marijuana and that he had in fact notified the DEA that approximately 100 pounds of marijuana were in the trunk of the car.

The Fifth Circuit has clearly established that the recognizable smell of marijuana gives rise to probable cause supporting a warrantless search. *United States v. Rivera*, 595 F.2d 1095 (5th Cir. 1979); *United States v. Barnard*, 553 F.2d 389, 391 (5th Cir. 1977); *United States v. Diaz*, 541 F.2d 1165, 1166 (5th Cir. 1976); *United States v. Coffey*, 520 F.2d 1103, 1104 (5th Cir. 1975).

We therefore find that the warrantless search of the opaque packages found to contain marijuana met the constitutional guidelines delineated by the Supreme Court of the United States. Since no basis exists for disputing the trial judge's conclusions, we hereby affirm his denial of the motion to suppress.

B. *Classification Methaqualone*

■ The appellant disputes the authority of the DEA administrator to classify

---

4. The Supreme Court has granted certiorari in *United States v. Ross*, 655 F.2d 1159 (D.C. Cir. 1981) (en banc), specifically directing the parties to address the issue of whether the Court should reconsider its holding in *Robbins*, with regard to warrantless searches of opaque containers. Oral argument in *Ross* was heard before the Supreme Court on March 1, 1982. 30 Cr. L. 4240 (March 10, 1982).

methaqualone as a Schedule II controlled substance. Because this objection was never raised before or during trial, this court will not consider it unless manifest injustice would otherwise ensue. Since we have held that admission of the marijuana was proper, no manifest injustice would appear to result from the court's refusal to decide this issue raised for the first time on appeal.

Even conceding *arguendo* the possibility of manifest injustice were we to decline review of the appellant's challenge, we reject his claim on the merits. Lueck's argument is twofold: He contends, first, that the DEA was without authority to classify methaqualone as a controlled substance because at the time that the administrator did so, only the Attorney General of the United States possessed the power to classify. This contention is in direct opposition to the Fifth Circuit's holding in *United States v. Gordon*, 580 F.2d 827, 840 (5th Cir. 1978). In *Gordon*, the Fifth Circuit found constitutionally permissible the scheduling by the DEA administrator of methaqualone pursuant to the delegation of authority from Congress to the Attorney General and through him to the DEA. *See also United States v. Goodman*, 605 F.2d 870, 887–88 (5th Cir. 1979). The second prong of the appellant's argument questions the propriety of the delegation of authority from the Attorney General to the DEA administrator pursuant to Executive Order No. 11727 of July 6, 1973, effective July 1, 1973, because no Attorney General was in office between the time of issuance of the order and classification of methaqualone as a Schedule II controlled substance on October 2, 1973. Section 508 of Title 28 of the United States

Code [5] provides for the order of succession in the event the office of Attorney General is vacant. Any designated successor shall "act as Attorney General" and is empowered to transfer to the DEA authority to classify controlled substances pursuant to executive order. We therefore find that the classification of methaqualone was duly authorized.

### C. *Jury Instructions*

The final objection raised by the appellant disputes the validity of the trial court's instruction to the jury defining "a place outside the United States" within the meaning of the applicable criminal statute, 21 U.S.C. § 952(a).[6] The appellant contends that the definition offered by the court failed to explain fully and fairly the offense of importation and, therefore, constituted an abuse of discretion.

Count One of the indictment charges Lueck with importing marijuana and methaqualone into the United States in violation of Section 952(a) of Title 21 of the United States Code. This provision forbids the importation into the United States "from any place outside thereof, any controlled substance." Thus, the importation of illicit drugs from a place *outside* the United States is an essential element of the offense, to be proved beyond a reasonable doubt. The judge offered the following definition to instructing the jury:

> The term "import" means with respect to a controlled substance, any bringing in or introduction of a controlled substance into any area of the United States from a place outside thereof.

**5.** Section 508 provides as follows:

(a) In case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office, and for the purpose of section 3345 of title 5 the Deputy Attorney General is the first assistant to the Attorney General.

(b) When by reason of absence, disability, or vacancy in office, neither the Attorney General nor the Deputy Attorney General is available to exercise the duties of the office of Attorney General, the Associate Attorney General shall act as Attorney General. The Attorney General may designate the Solicitor General and the Assistant Attorneys General, in further order of succession, to act as Attorney General.

**6.** Section 952(a) renders it illegal "to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter . . ."

A place outside the United States includes any place including airspace in excess of twelve geographical miles seaward from the east coast of Florida.

R. Vol. at 340–341; R. Vol. V at 689.

Lueck now complains that the above definition was both overbroad and in conflict with the terms of § 952(a). The twelve mile limitation referred to in the judge's instruction represents the extent of customs territory. *United States v. Williams*, 617 F.2d 1063, 1073 n. 3 (5th Cir. 1980) (en banc). Any point outside this twelve mile limit of airspace and waters constitutes "a place outside the United States" for purposes of proving importation under section 952(a). We reject the position of the appellant that the proof of importing controlled substances from a specific point on foreign soil is required. The fact of crossing the boundary of the United States with contraband suffices to establish importation:

Had their cargo of contraband originated in, say, Texas, that would not alter the fact that it was meant to re-enter the United States from international waters. That is enough.

*United States v. Peabody*, 626 F.2d 1300, 1301 (5th Cir. 1980). *See also United States v. Doyal*, 437 F.2d 271, 274–5 (5th Cir. 1971). We conclude that the definition offered by the trial judge fully and fairly explained to the jury the meaning of the phrase, "to import into the United States from any place outside thereof."

The conviction of the appellant is hereby AFFIRMED.