[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 21-11341

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ROBERT DAYON DUMAS,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:18-cr-00326-TPB-TGW-1

————————————————

Before JORDAN, ROSENBAUM, and NEWSOM, Circuit Judges.

PER CURIAM:

Following his conviction on five counts of Hobbs Act robbery, Robert Dayon Dumas appeals the district court's denial of his motion to suppress the items obtained during a warrantless search of his vehicle and the statements he made to the police following his arrest. The district court concluded that suppression of the evidence was not warranted because the police officer had probable cause to search Mr. Dumas' vehicle for marijuana, the robbery items unrelated to the search for marijuana were in plain view during a lawful search of the vehicle, and Mr. Dumas knowingly and voluntarily waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 439 (1966).

After review of the parties' briefs and the record, and with the benefit of oral argument, we conclude that the district court did not err in denying Mr. Dumas' motion to suppress. We therefore affirm.

**I**

**A**

During the five-day time period from February 8, 2018, until February 13, 2018, an unidentified man committed a series of five armed robberies in Wesley Chapel, Florida.

Specifically, on February 8, 2018, an unknown "white or Hispanic male," approximately five feet, nine inches, to six feet in height and wearing "all black"—including a "ski mask" and a dark

hat with a white emblem in the front—entered a Citgo gas station brandishing a "black semi auto with a stainless upper slide handgun." The suspect pointed the firearm at a store employee, chambered a round, and demanded money from the register. The employee complied, and the suspect fled on foot with $800.

Approximately 90 minutes later that same day, a suspect matching the description of the Citgo gas station assailant robbed a Best Western hotel. The suspect, armed with a black frame semiautomatic handgun with a silver upper slide, demanded that the clerk "open the safe." As the clerk attempted to open the lock to the safe, "the suspect fired one shot into the wall above the clerk." The suspect told the employee, "the next one goes in your head!" The suspect took approximately $500 from the register and the safe and fled. A witness reported a "dark color[ed] sedan leaving the hotel entrance."

Two days later, a suspect described as a "white male" and "wearing all black," including a "ski mask," robbed a Metro PCS store. The suspect wore black Nike sneakers with white soles. The suspect had a "black semi auto handgun," demanded money from the register, and "fired one shot into the wall." The suspect took approximately $820 from the register and fled." The police suspected that a "light colored 2015-2017 Nissan Altima" was involved based on surveillance from a neighboring business.

Three days after the Metro PCS robbery, a suspect described as a "white male" in his "late 20's to early 30's" and wearing "black clothing," a "ski mask," and "wire rim glasses," robbed a B Creative

painting studio. Once again, the suspect demanded money and obtained approximately $60. When the employee told the suspect that there was no more money, the suspect "cocked" the firearm, which was believed to be a "9mm."

About 30 minutes after that robbery, a similar suspect wearing all black clothing, including a black ski mask and gloves, robbed a Subway restaurant. The suspect demanded money from the cash register and the safe. The suspect fled the location in a vehicle after he received money in a "grey bank bag."

This armed-robbery spree was investigated by the Pasco County Sheriff's Office Strategic Target Area Response ("STAR") team, which conducts "investigations related to property crime, burglaries, robberies, and grand theft autos." Corporal Andrew Denbo, a seven-year veteran of the Pasco County Sheriff's Office, was a member of the STAR team involved in investigating this string of robberies in the "new and upcoming" Wesley Chapel area. Corporal Denbo was one of the first officers at the scene of the Metro PCS store robbery. Given that there was not a lot of crime in the Wesley Chapel area, the investigation into these robberies was the highest priority.

**B**

On March 11, 2018, Corporal Denbo conducted a traffic stop after he observed, and confirmed on the radar of his patrol car, a "black Audi sedan" traveling at 75 miles per hour in a 55-miles-per-hour zone. Mr. Dumas was the driver and sole occupant of the car. Corporal Denbo approached the vehicle, and asked Mr. Dumas for

his license and registration.  Corporal Denbo also asked Mr. Dumas where he was headed and if he had received any citations before. Mr. Dumas provided his license and registration and responded that he had previously received one citation.

After Corporal Denbo returned to his patrol car, he ran the driver license and registration to check the status of the vehicle and Mr. Dumas' driving history.  Corporal Denbo learned that, although the car registration was valid, Mr. Dumas had received a couple of warnings from the Pasco County Sheriff's Office as well as several citations in other jurisdictions.  Corporal Denbo returned to Mr. Dumas' vehicle to speak with him.

When Corporal Denbo approached the vehicle the second time, Mr. Dumas appeared "nervous," seemed "uncomfortable," "kept looking around the car," and was "slow" to respond to Corporal Denbo's questions.  According to Corporal Denbo, Mr. Dumas was looking at the "front passenger seat of the vehicle," but Corporal Denbo could not see what he was looking at.  Corporal Denbo then repositioned himself and leaned forward and down, so that he could look around Mr. Dumas' body and into the passenger seat.  At that point, Corporal Denbo was "[l]ess than a foot" away from the rolled-down window of Mr. Dumas' car.  Corporal Denbo then observed a partially unzipped bag in the passenger seat, detected the odor of marijuana coming from within the vehicle, and noticed "shake," or small pieces of green leafy substances, all throughout the vehicle's passenger seat.

After making these observations, Corporal Denbo asked Mr. Dumas to step out of the vehicle.  Corporal Denbo also asked Mr. Dumas if he had any weapons, and he responded that he had a gun, a Glock 17, that was in the bag on the passenger seat.  Corporal Denbo handcuffed Mr. Dumas, placed him on the curb, removed the bag from the vehicle, and took the gun out of the bag and secured it.  Corporal Denbo then called and waited for backup to arrive before searching the vehicle.

When Corporal Denbo searched Mr. Dumas' vehicle he found a "piece of marijuana," "smaller pieces throughout," and "a green leafy substance" on the floorboard that he believed to be "marijuana."  According to Corporal Denbo, there was also a "marijuana cigarette in the center console ashtray of the vehicle."  Corporal Denbo further found a "scale" that was "seated next to the driver in the center console, which had small flakes of marijuana on it and smelled of marijuana."  Corporal Denbo field-tested the substance he found, and the result was positive for marijuana.

In the backseat of the vehicle, Corporal Denbo found a "mask" that was "shoved" into the bottom of the pocket directly behind the passenger seat.  The backseat of the vehicle contained several items of clothing, shoes, and personal effects, including a "pair of black Nike shoes with a white bottom" and a "New York Yankees [baseball] hat."  Corporal Denbo also found "black baseball gloves in the backseat," along with a "black t-shirt," and a "dark grey bank bag."  He also found suitcases in the trunk which contained black clothing.

## C

Following the search, Corporal Denbo placed Mr. Dumas in the back of a patrol car and read him his *Miranda* rights from an agency-issued card. After reading the *Miranda* rights to Mr. Dumas, Corporal Denbo asked him about the marijuana and the mask in his car. Mr. Dumas responded that "he just used marijuana, and when he played baseball [ ] they didn't drug test him so it wasn't a problem." Mr. Dumas claimed he did not know anything about the mask. Corporal Denbo arrested Dumas for possession of marijuana and transported him to the Sheriff's district office.

While Corporal Denbo was waiting for detectives to arrive at the district office, he gave Mr. Dumas a copy of a multipurpose release/waiver form, which Mr. Dumas signed in his presence. Specifically, Mr. Dumas signed the section titled "Statement of Miranda Rights," which explained the *Miranda* rights, but he did not sign any of the remaining sections, including the section titled "Waiver of Rights."

Mr. Dumas was then interviewed by Detective Toner and Agent Lanier at the Sheriff's district office. When Mr. Dumas was first questioned about his involvement in the armed robberies, he denied any participation. But, when Corporal Denbo was later transporting Mr. Dumas to the Pasco County jail, Mr. Dumas began to admit his involvement in the robberies. Corporal Denbo then returned Mr. Dumas to the Sheriff's district office, where he provided a full video-taped confession. Nearly eight hours had

elapsed from the time Corporal Denbo searched Mr. Dumas' car to the time he confessed.

## D

A grand jury indicted Mr. Dumas on five counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), and two counts of discharging a firearm during two of the robberies, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).  After his indictment, Mr. Dumas filed a motion to suppress all evidence derived from the warrantless search of his vehicle because, in his view, there was no probable cause.  Mr. Dumas also moved to suppress his incriminating statements because he asserted that he was not properly advised of his *Miranda* rights.  Mr. Dumas, however, did not challenge the validity of the traffic stop in his motion to suppress.

At the suppression hearing, Corporal Denbo was the only witness.  Corporal Denbo testified in part that when he searched Mr. Dumas' vehicle and saw the mask, the black gloves, the Yankees hat, the Nike shoes, the black clothing, and the bag, he "believed [Mr. Dumas] was a suspect of [the] robberies at that time." D.E. 72 at 53.  During both direct and cross-examination, Corporal Denbo admitted that under the rules and policies of the Pasco County Sheriff's Office, his camera should have been turned on sooner than it had been.

Following the hearing, the district court entered an order denying Mr. Dumas' motion to suppress.  The district court found Corporal Denbo credible and ruled that he had probable cause to search Mr. Dumas' vehicle based on the odor of marijuana

emanating from the vehicle. The district court also ruled that Corporal Denbo's detection of the odor of marijuana, his observation of marijuana in the vehicle, and Mr. Dumas' admission of using marijuana established sufficient probable cause to support Mr. Dumas' arrest for possession of marijuana. Additionally, the district court concluded that there was no basis to suppress the items related to the robberies because they were found in plain view during a lawful search of the vehicle. Finally, the district court ruled that incriminating statements made by Mr. Dumas were admissible because he knowingly and voluntarily waived his *Miranda* rights.

In light of the district court's ruling and Mr. Dumas' desire to expedite the appeal of the district court's order, the parties agreed to a streamlined bench trial. After a short trial, the district court found Mr. Dumas guilty of all charges and sentenced him to 25 years in prison.

This appeal followed.

**II**

On appeal, Mr. Dumas argues that the district court erred in denying his motion to suppress for three reasons. First, the district court erred in finding that Corporal Denbo had probable cause to search and arrest him for possession of marijuana because Corporal Denbo was "anything but a credible witness[.]" Appellant's Br. at 22. Second, the district court erred in finding that Corporal Denbo properly seized numerous items unrelated to marijuana possession because there was no probable cause to seize those items. *See id.* at 23. Finally, the district court erred in finding that he waived his

*Miranda* rights because Corporal Denbo failed to "secure a valid waiver." *Id.* at 39.

We are unpersuaded by Mr. Dumas' arguments that the district court committed any error. We therefore affirm the district court's denial of Mr. Dumas' motion to suppress.

## A

We begin by addressing Mr. Dumas' challenges to the district court's probable cause rulings.

Probable cause is a mixed question of law and fact subject to plenary review. *See Ornelas v. United States*, 517 U.S. 690, 696–97 (1996). We review factual findings for clear error and the application of the law to those facts *de novo* in an appeal from the denial of a motion to suppress. *See United States v. Caraballo*, 595 F.3d 1214, 1222 (11th Cir. 2010). We construe all facts in the light most favorable to the party prevailing below—the government in this instance. *See United States v. Bervaldi*, 226 F.3d 1256, 1262 (11th Cir. 2000).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. In most circumstances, unless there is consent, police officers must obtain a warrant supported by probable cause to justify a search under the Fourth Amendment. *See United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005). One exception to the warrant requirement is the so-called automobile exception, which allows police to conduct a search of a vehicle if (1) the

21-11341                Opinion of the Court                11

vehicle is readily mobile, and (2) the police have probable cause for the search. *See United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007). No separate exigent circumstances need to be shown. *See Maryland v. Dyson*, 527 U.S. 465, 466 (1999). The validity of the search turns on whether there was probable cause to believe the vehicle contained contraband or evidence of a crime. *See id.*

### 1

Probable cause exists when, "under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *Lindsey*, 482 F.3d at 1293 (quotation marks omitted). Specifically, when an officer detects the odor of marijuana emanating from a vehicle, there is probable cause to support a warrantless search of the vehicle. *See United States v. Johns*, 469 U.S. 478, 482 (1985) ("After the officers came closer and detected the distinct odor of marihuana [sic], they had probable cause to believe that the vehicles contained contraband."); *Merricks v. Adkisson*, 785 F.3d 553, 560 n.3 (11th Cir. 2015) (noting that "the smell of burnt marijuana emanating from a vehicle is sufficient probable cause to search a vehicle"). *See also United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana."); *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982) ("[T]he recognizable smell of marijuana gives rise to probable cause supporting a . . . search.").

Here, Corporal Denbo—whose testimony the district court credited—smelled marijuana when he returned to speak to Mr. Dumas while conducting a valid traffic stop. After Corporal Denbo witnessed Mr. Dumas nervously looking at the bag in the passenger seat, he shifted his position to lean forward and down to have a better view of the passenger seat. At that point, Corporal Denbo—who was standing "[l]ess than a foot" away from the rolled down window of Mr. Dumas' car—detected the odor of marijuana coming from within the vehicle, and noticed "shake" (or small pieces of green leafy substances) all throughout the vehicle's passenger seat. Corporal Denbo, who had extensive training and experience with marijuana in his law enforcement career, thus had probable cause to conduct a warrantless search of Mr. Dumas' car for evidence of marijuana. *See Johns*, 469 U.S. at 482; *Tobin*, 923 F.2d at 1512.

Mr. Dumas challenges the district court's conclusion that there was probable cause to search the vehicle based on the odor of marijuana emanating from the vehicle because Corporal Denbo was not "a credible witness." Appellant's Br. at 25. According to Mr. Dumas, Corporal Denbo "inexplicably" failed to record all of the "most crucial moments" that allegedly gave him probable cause to search the vehicle, which included the interactions with Mr. Dumas at the driver-side window. *Id*. at 26.

Mr. Dumas' argument fails because even if Corporal Denbo's camera had been turned on, it could not have captured the smell of marijuana. At the suppression hearing Mr. Dumas "did

not present any testimony or evidence to contradict Corporal Denbo's testimony" as to the smell of marijuana, *see* D.E. 80 at 4, and he does not do so on appeal. As the district court observed, moreover, Corporal Denbo's testimony was "consistent with what was eventually found in the vehicle." *Id*. at 3–4. There was also the near contemporaneous video of Corporal Denbo searching Mr. Dumas' vehicle, which revealed evidence of a leafy substance and marijuana paraphernalia, as well the questioning of Mr. Dumas in the back of the patrol car. This corroborated Corporal Denbo's testimony that he smelled and observed marijuana in Mr. Dumas' vehicle.

In sum, we cannot say that the district court, which had the benefit of observing Corporal Denbo, erred in crediting his testimony. *See United States v. Holt*, 777 F.3d 1234, 1255–56 (11th Cir. 2015) ("We accept the factfinder's choice of whom to believe unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it . . . Thus, we defer to the district court's factual determinations unless the district court's understanding of the facts is unbelievable.") (internal quotation marks and citation omitted). Corporal Denbo had probable cause to search Mr. Dumas' vehicle.

**2**

Additionally, the district court did not err in ruling that Corporal Denbo had probable cause to arrest Mr. Dumas for misdemeanor possession of marijuana. As the district court noted, Mr. Dumas' arrest for possession of marijuana was based on "Corporal

Denbo's detection of the odor of marijuana, observation of mariju-ana in the vehicle, and [Mr. Dumas'] statement admitting that he had used marijuana." D.E. 80 at 5–6. Given these facts, Corporal Denbo had probable cause to arrest Mr. Dumas for possession of marijuana. *See United States v. Tate*, 855 F. App'x 509, 512 (11th Cir. 2021) (holding that there was probable cause to arrest defendant for possession of marijuana because the police officers found him passed out in the driver's seat of his vehicle at an intersection, he was described as drowsy and loopy, and the police officers claimed to see an item that looked like a blunt in the center console).

Mr. Dumas' challenge to the probable cause determination of his arrest for possession of marijuana focuses, once again, on at-tacking the credibility of Corporal Denbo due to his failure to rec-ord the entirety of the encounter. *See* Appellant's Br. at 26–31. Mr. Dumas' arguments as to the constant deactivation of the camera, which Corporal Denbo admitted was in violation of the rules and policies of the Pasco County Sheriff's Office, and the fact that the marijuana cigarette was not among the items inventoried from the car, are well taken but they do not alter our conclusion.

First, Corporal Denbo recorded key critical moments of his encounter with Mr. Dumas that support the conclusion that he had probable cause to arrest him for possession of marijuana. Corporal Denbo, for example, recorded the search of Mr. Dumas' car, which showed evidence of marijuana particles as well as drug parapher-nalia (i.e., the scale) in the car. Corporal Denbo also recorded the field test that he conducted of a clump of marijuana found in the

vehicle, which yielded a positive result. And Corporal Denbo recorded his interview of Mr. Dumas in the back of his patrol vehicle, in which he admitted that he used marijuana. Thus, Mr. Dumas' argument that there was no evidence to support the district court's probable cause determination is incorrect. Probable cause "does not require convincing proof." *Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003) (citation omitted).

Second, the district court explicitly acknowledged the credibility concerns that Mr. Dumas now raises. Indeed, the district court went out of its way to explain that "[w]ith the advent of modern technology . . . it is increasingly difficult to understand why law enforcement officers are either unwilling or unable to consistently record encounters with the public." D.E. 80 at 7. According to the district court, "had Corporal Denbo recorded his entire encounter with [Mr. Dumas] on his body camera in this instance, it is highly unlikely the instant motion would have been filed in the first place." *Id.* at 8. Nevertheless, the district court found Corporal Denbo's testimony to be credible because "[a]lthough it is certainly the better practice for law enforcement officers to record encounters with the public, there is no legal requirement that they do so." *Id.* Given the consideration the district court gave to the issue of Corporal Denbo's body camera after listening to the testimony and reviewing the evidence, which included more than three hours of cross-examination by Mr. Dumas' counsel, this is not one of those rare instances where the credibility determination and finding of probable cause cannot stand.

**3**

We next address the district court's ruling that the items un-related to the possession of marijuana did not have to be sup-pressed.  The district court explained that Corporal Denbo's belief that the items were linked to the recent armed robberies that he had "personally investigated" was not "mere speculation," and that the items were found in "plain view" during a lawful search of Mr. Dumas' vehicle.  *See* D.E. 80 at 5.  We agree.

The plain-view doctrine permits the warrantless seizure of an object where an officer is lawfully located in a place from which the object can be plainly viewed, the officer has a lawful right to access the object, and the incriminating character of the object is "immediately apparent."  *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006) (citing *Horton v. California,* 496 U.S. 128, 136–37 (1990)).  The plain-view doctrine applies, for example, when, dur-ing the course of a lawful search for certain objects, the police come across other items of incriminating character.  *See Smith*, 459 F.3d at 1290.  For an item's incriminating character to be "immediately apparent," the police must have probable cause to believe the ob-ject in plain view is contraband or evidence of a crime.  *See Minne-sota v. Dickerson*, 508 U.S. 366, 375 (1993).

Corporal Denbo was lawfully located and had a lawful right to access Mr. Dumas' vehicle when he was searching for marijuana. Indeed, as previously discussed, Corporal Denbo had probable cause to search the car for evidence of marijuana.  Therefore, the

first two elements of the plain view inquiry are satisfied.  *See United States v. Baldwin*, 774 F.3d 711, 720 (11th Cir. 2014) ("Once probable cause exists to search the vehicle, the police may search all parts of the vehicle, and any containers therein, where the object of the search might be found.") (citing *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999)).

As to the third element—whether the incriminating character of the object is immediately apparent—it is satisfied as well.  At the suppression hearing, Corporal Denbo testified that "[he] personally believed [Mr. Dumas] was responsible" for the robbery spree in the Wesley Chapel area.  *See* D.E. 72 at 55–56.  Corporal Denbo's belief is not, of course, dispositive because "probable cause is an objective standard[.]" *District of Columbia v. Wesby*, 138 S. Ct. 577, 584 n.2 (2018).  But that belief was based on his discovery of items that resembled items from the recent armed robberies, including (1) a dark grey bank bag, (2) black Nike shoes with white soles, (3) a black mask, (4) black gloves, and (5) black clothing.  *See* D.E. 72 at 22, 44, 48–49.  Corporal Denbo also testified that Mr. Dumas resembled the robbery suspect because he was of the same "race" as the suspect, and had a similar "height" and "body type." *See id*. at 46.  In particular, Corporal Denbo noticed that Mr. Dumas had "thicker eyebrows" and "blue eyes," which matched the description of the robbery suspect. *See id*. at 47.  Corporal Denbo testified that Mr. Dumas' vehicle, a black Audi sedan, and the vehicle that Mr. Dumas' mother drove to the scene of his arrest, a white sedan, matched the description of the cars in the "be on the lookout" (BOLO) notices. *See id*.  Finally, Corporal Denbo testified that

the black handgun Mr. Dumas had in his car, including its Luger ammunition, resembled the black handgun the robber had brandished in two of the robberies and the Luger shell casings that were recovered at one of the robbery scenes. *See id*. at 48.

In light of this testimony, a reasonable officer with Corporal Denbo's prior knowledge about the recent armed-robbery spree could conclude that the items in the vehicle were evidence of the recent armed robberies. The district court, therefore, did not err in denying Mr. Dumas' motion to suppress on this ground. *See United States v. Reeves*, 604 F. App'x 823, 828–829 (11th Cir. 2015) (holding that the district court did not err in denying a motion to suppress evidence that a police officer found in plain view during a lawful search of the defendant's backpack that was located in his vehicle and contained items—a laptop computer, approximately thirty credit cards, and a notebook with names, dates of birth, and social security numbers—whose incriminating character was immediately apparent to the police officer as evidence of fraud). *Cf. Baldwin*, 774 F.3d at 720 (holding that the district court did not err in denying a motion to suppress because "mail from the IRS not addressed to [the defendant] or the other passenger in the vehicle, debit cards not in their names, and currency within plain view" were sufficient to establish probable cause to search the vehicle for evidence of identity theft and tax fraud).

Mr. Dumas challenges the district court's ruling because "none of the seized items unrelated to the marijuana possession were incriminatory on their face." Appellant's Br. at 36–37.

According to Mr. Dumas, "[t]here is nothing immediately criminal about clothing, shoes, baseball equipment, or even a securely encased firearm." *Id*. at 37. Mr. Dumas' argument, however, fails. As the district court observed, "Corporal Denbo had personally investigated some of those robberies so he had particularized familiarity with the circumstances of those crimes." D.E. 80 at 5.

We find instructive and persuasive our decision in *United States v. Rivera*, 824 F. App'x 930, 934 (11th Cir. 2020). In *Rivera*, five convenience stores in the Tampa area were robbed in a ten-day period by an unknown Hispanic male brandishing a short-barreled shotgun. *See id*. at 932. In four of the robberies, the suspect appeared to be wearing "the same white athletic shoes with black edging." *Id*. During the course of the police investigation, the police witnessed a domestic violence incident at a motel involving one of the robbery suspects. *See id*. After the police entered a motel room to check on the safety of the victim, and in the process of conducting a protective sweep of the motel room, the police officers "saw a white athletic sneaker with a black trim on the floor of the motel room." *Id*. In affirming the district court's denial of a motion to suppress, the panel held that "the plain-view doctrine applie[d] to the discovery of the sneaker because it was in plain view and its incriminating character would have been immediately apparent to the officers" because "[t]he masked robber was wearing sneakers with the same distinctive pattern, [the suspect] matched the description of a man wearing similar sneakers just before the robbery, and [a car] linked to at least one of the robberies was parked at the motel." *Id*. at 934. The panel explained that

although "mere possession of a similar sneaker alone might not be enough . . . the combined circumstances made the incriminating character of the sneaker in the motel room where [the suspect] was present immediately apparent." *Id.*

As in *Rivera*, the record here reveals that the incriminating character of the Nike sneakers and other items that were found in Mr. Dumas' vehicle was immediately apparent to Corporal Denbo, who was intimately involved in the investigation of the recent armed-robbery spree in the Wesley Chapel area. Corporal Denbo testified that he was among the first officers on the scene at the Metro PCS robbery, so he remembered that Mr. Dumas' description matched the "description that the victim had provided in that particular case." D.E. 72 at 47. Furthermore, according to Corporal Denbo, who had personally reviewed the security footage many times, the suspect of the Metro PCS robbery wore black "Nike shoes with [ ] white sole[s]," a black ski "mask," "black gloves," and was armed with a "9 millimeter handgun." *Id.* at 48–50. Although we recognize, as did the panel did in *Rivera*, that mere possession of a common pair of black Nike shoes alone might not be enough, we conclude that under the totality of the circumstances, the incriminating character of the items in Mr. Dumas' vehicle was immediately apparent to Corporal Denbo. *See Rivera*, 824 F. App'x at 934.

Contrary to Mr. Dumas' contention, Corporal Denbo's belief was not "mere speculation." Appellant's Br. at 33. Although Mr. Dumas highlights some factual differences from the BOLOs,

such as the gun with a silver or stainless-steel upper slide and the height differences of the suspect, those discrepancies ignore the remaining similarities previously discussed that led Corporal Denbo to believe that Mr. Dumas was involved in the armed robberies. Probable cause turns on the "assessment of probability in particular factual contexts[.]" *Wesby*, 138 S. Ct. at 590 (citation and internal quotation marks omitted). *See also Brinegar v. United States*, 338 U.S. 160, 175 (1949) ("In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.").

Finally, Mr. Dumas claims that Corporal Denbo "twice admitted, on video, that there was not probable cause to charge Mr. Dumas with the robberies." Appellant's Br. at 35. Mr. Dumas reasons that because an assistant state attorney purportedly determined that there was no probable cause to arrest Mr. Dumas for the robberies, then "there was no probable cause to seize items speculated to be involved in the robbery." *Id*. Mr. Dumas' argument, however, does not carry the day because the subjective beliefs of Corporal Denbo or the assistant state attorney are irrelevant to probable cause's objective analysis. *See Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) ("[T]he subjective beliefs of Detective Singer are irrelevant to our probable cause analysis. Probable cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been."). *See also Whren v.*

*United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

### III

We conclude by addressing the argument that the district court erred in finding that Mr. Dumas waived his *Miranda* rights. *See* Appellant's Br. at 38–41.

### A

*Miranda* effectuates the Fifth Amendment's protection against self-incrimination and requires that defendants be informed of their rights. *See Moran v. Burbine*, 475 U.S. 412, 420 (1986). A valid waiver of *Miranda* rights must be voluntary, knowing, and intelligent. *See United States v. Lall*, 607 F.3d 1277, 1283 (11th Cir. 2010). Finding a valid waiver requires a two-step inquiry. We ask whether the waiver was (1) a "free and deliberate" choice (2) made with a "full awareness" of the Fifth Amendment's protections and the consequences of abandoning them. *See id.* (internal quotation marks omitted). We find voluntary waiver only "if the totality of the circumstances surrounding the interrogation reveal both an un-coerced choice and the requisite level of comprehension." *United States v. Bernal-Benitez*, 594 F.3d 1303, 1318 (11th Cir. 2010) (internal quotation marks omitted).

We conclude that Mr. Dumas freely and deliberately waived his *Miranda* rights when he spoke to law enforcement. When ana-lyzing if waiver was "free and deliberate," we consider "the defend-ant's intelligence, the length of his detention, the nature of the in-terrogation, the use of any physical force against him, or the use of

any promises or inducements by police." *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003). As the district court observed, when Mr. Dumas was detained he was "23 years old and had a high school education." D.E. 80 at 5. And there is no argument, evidence, or allegation that Mr. Dumas was coerced when he spoke to Corporal Denbo in his patrol car or after he was taken to the Sheriff's district office.

We also conclude that Mr. Dumas had full awareness of the Fifth Amendment's protections and the consequences of abandoning them. When analyzing these issues, we pay special attention to the defendant's intelligence and mental capacity. *See Coleman v. Singletary*, 30 F.3d 1420, 1426 (11th Cir. 1994). Nothing in the record shows that Mr. Dumas' intelligence prevented him from appreciating the importance of his rights or the choice to waive them. After Corporal Denbo read Mr. Dumas his *Miranda* rights in the back of the patrol car aloud, Mr. Dumas affirmed that he understood his rights, as evidenced by the video. Likewise, Mr. Dumas was informed again of his Fifth Amendment rights at the Sheriff's district office, where he signed the multi-purpose form. Because Mr. Dumas was an adult of at least average intelligence, who spoke English fluently, he had full awareness of his rights.

Based on the totality of the circumstances, the district court did not err when it found that Mr. Dumas knowingly and voluntarily waived his *Miranda* rights. *See Berghuis v. Thompkins*, 560 U.S. 370, 388–89 (2010) ("In sum, a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda*

rights, waives the right to remain silent by making an uncoerced statement to the police.").

**B**

Finally, Mr. Dumas contends that Corporal Denbo's reading of his *Miranda* rights was too quick to secure a valid waiver. Corporal Denbo, he points out, read 100 words in 13 seconds. *See* Appellant's Br. at 39. Though a police officer should not speed-read *Miranda* rights, here the video depicting the moment Corporal Denbo read Mr. Dumas his *Miranda* rights in the back of the patrol car demonstrates that Corporal Denbo read the *Miranda* rights at a speed that adequately enabled Mr. Dumas to understand his rights. Although Corporal Denbo read the *Miranda* rights swiftly, it was not so fast that they were incomprehensible, particularly given that Corporal Denbo paused after reading each right, that he explicitly asked Mr. Dumas whether he understood the rights that he read to him, and that Mr. Dumas said he did. In sum, Mr. Dumas has failed to convince us that the manner in which Corporal Denbo read him his *Miranda* rights was not understandable or unclear as a matter of law.

Mr. Dumas also contends that law enforcement's failure to obtain his written waiver of *Miranda* rights at the Sheriff's district office means he did not waive his rights there. *See* Appellant's Br. at 41. We find this argument unconvincing as well. "A signed *Miranda* waiver is usually strong evidence that the defendant waived his rights, *but it is not necessary*." *Bernal-Benitez*, 594 F.3d at 1319 (emphasis added). *See North Carolina v. Butler*, 441 U.S. 369, 373

(1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver.").  The fact that Mr. Dumas did not sign the "Waiver of Rights" portion of the *Miranda* form he signed at the Sheriff's district office does not mean he did not waive his *Miranda* rights.  *See Bernal-Benitez*, 594 F.3d at 1319 (rejecting defendant's argument that he did not freely and knowingly waive his *Miranda* rights because he did not sign the *Miranda* waiver form presented to him).

### IV

We affirm the district court's denial of Mr. Dumas' motion to suppress the evidence obtained during the search of his vehicle and the incriminating statements he made following his arrest.

**AFFIRMED.**